[Sac. No. 7985. In Bank. July 2, 1974.]

*LAURA COOPER et al., Plaintiffs and Appellant, v.
DAVID B. SWOAP, as Director, etc. Defendant and Respondent.

*Reporter's Note: This case was previously entitled "Cooper *v.* Carleson."

## COUNSEL

Ralph Santiago Abascal, Edmund S. Schaffer, Jay-Allen Eisen and Eugene S. Swann for Plaintiff and Appellants.

Evelle J. Younger, Attorney General, Elizabeth Palmer, Assistant Attorney General, N. Eugene Hill, Raymond M. Momboisse and John Fourt, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**TOBRINER, J.**—In this case, as in the companion case of *Waits* v. *Swoap, post,* page 887 [115 Cal.Rptr. 21, 524 P.2d 117], we must determine the validity, under state and federal law, of an administrative welfare

regulation promulgated by the State Department of Social Welfare subsequent to the enactment of the Welfare Reform Act of 1971. The regulations at issue in both cases represent variations on a single administrative theme: that "noncash economic benefits" enjoyed by certain recipients of aid to families with dependent children (AFDC) may be treated as "income" of such recipients so as to warrant a reduction of their welfare grants.[1] The regulation challenged in the instant case finds that such "noncash economic benefits" may arise when AFDC recipients share housing with a recipient of one of the state's "adult aid" programs; accordingly, in such situations the regulation requires that the AFDC grant be reduced by a designated sum. The principal question presented is whether this particular regulation, and, more generally, the entire "noncash economic benefit" concept, is consistent with the governing statutory scheme.

■ For the reasons discussed more fully below, we have concluded that the regulation at issue here cannot be squared with the controlling provisions of the Welfare Reform Act of 1971, and is therefore invalid. Initially, we shall point out that at the time the 1971 legislation was enacted a provision identical to the instant regulation was proposed by the administration but was decisively rejected by the Legislature; thus, the legislative history provides perhaps the clearest indication that the present regulation is inconsistent with legislative intent.

Moreover, we shall explain that on a more general level the department's newly devised "noncash economic benefit" concept is completely at odds with the "flat grant" system of welfare benefits that lies at the heart of the 1971 welfare reform legislation. In establishing a flat grant system, the Legislature consciously abandoned the previous practice under which welfare grants were set on the basis of an administrative determination of need; instead, the Legislature took it upon itself to set fixed grant levels to be paid to *all* recipients without regard to individual need. The regulation at issue directly contradicts this flat grant approach, reducing certain recipients' grants on the basis of an administrative judgment that such recipients have less need than other recipients.

Although the department defends its new approach on the ground that "noncash economic benefits" generally, and shared housing in particular,

[1]In *California Welfare Rights Organization* v. *Brian* (1974) *ante*, page 237 [113 Cal.Rptr. 154, 520 P.2d 970], we recently examined a similar welfare regulation which reduced AFDC grants to expectant mothers on the rationale that the value of a pregnant woman's body represented deductible "income" to her fetus. In *Brian* we found the regulation invalid, concluding that the governing statutes could not reasonably be interpreted to authorize such deduction.

constitute "income" to recipients which may properly be considered in calculating welfare grants, such benefits have never been considered income throughout the entire history of California's welfare system, and we can find absolutely no indication that the Legislature intended to alter its consistent treatment of such "benefits." Moreover, with respect to the "adult aid" payments governed by the instant regulation, a specific statute explicitly mandates that such aid "shall not be construed as income" under these circumstances (Welf. & Inst. Code, § 11006). Finally, we shall explain that even if it were permissible to construe "noncash economic benefits" as income, the present regulation would be invalid for it does not measure the actual value of benefits received by an individual recipient but instead assigns an arbitrary, fictitious measure of income, in contravention of the controlling federal and state statutes.

Consequently, we have concluded that the challenged regulation cannot stand.

## 1. *The facts.*

Laura Cooper is a recipient of aid to the disabled (ATD); she lives with her five minor children and receives on their behalf aid to families with dependent children (AFDC). Moice Palladino has also been receiving ATD benefits for herself and AFDC benefits on behalf of her minor son. The ATD program covers only the mother's needs; the AFDC program covers the needs of the children.

Under the payment schedule established by the Legislature in Welfare and Institutions Code section 11450, the Palladino child was entitled at the time this litigation was instituted to a welfare grant of $115 per month (AFDC unit of one), and the Cooper children to a grant of $320 per month (AFDC unit of five). Because both of the families qualified for two welfare programs, however, the State Department of Social Welfare (department) directed that the grants to the children be reduced by application of its newly propounded Regulation 44-115.8,[2] the regulation at issue in the instant case. Under this new regulation, the Palladino child was to receive

---

[2]Regulation 44-115.8 provides that when one or more recipients of AFDC aid reside in the same household with one or more recipients of adult aid, "if the recipient's housing and utilities allowance exceeds his share of the actual cost of housing and utilities (including telephone) the excess shall be considered in-kind income and taken into consideration in computing the grant. [¶] Each recipient's share shall be calculated by dividing the total actual cost of housing and utilities (including telephone) by the number of persons (adults and minors, needy and non-needy) residing in the household."

$92 per month instead of $115 (a $23 deduction) while the Cooper children would obtain $289 per month instead of $320 (a $31 deduction).[3]

Mrs. Cooper and Mrs. Palladino, joined by the California Welfare Rights Organization, then instituted the present class action against the department challenging the validity of Regulation 44-115.8. All parties stipulated that no factual disputes existed and after oral argument the superior court granted the department's motion for summary judgment, concluding that the challenged regulation was valid under state and federal law. Plaintiffs appeal from that judgment.

2. *The governing statutory background.*

In determining whether or not the regulation before us is consistent with the current California statutory scheme, we must briefly review the historical background of the Welfare Reform Act of 1971. Prior to 1971, the Legislature had delegated to the department the authority to determine individual recipients' needs, and to pay corresponding benefits, up to a statutory maximum. The department accordingly promulgated detailed regulations specifying allowances for itemized needs. Allowances for non-housing items, such as food and clothing, were calculated on the basis of the age and sex of each family member, the family's size and county of residence; the housing and utilities allowances reflected actual payments for these commodities up to a specified maximum. Among the regulations previously in effect was former Regulation 44-115.61 which expressly declared that "partially free or shared living costs *do not represent income.*" (Italics added.)

Determining individual families' needs on the basis of such diverse factors as family composition and geography, however, proved unacceptably inefficient. The Reform Act of 1971 replaced this cumbersome system with a simple, uniform flat grant. The Legislature abolished the adminis-

---

[3]The deductions are calculated in the following manner. The Palladinos pay $88 per month on housing and utilities. The son's pro rata share is $44 (one-half of $88). The pro rata share ($44) is then deducted from the administrative "allowance" for housing and utilities for one AFDC child ($67); $67 less $44 yields $23 which is the purported value of the in-kind income to the child from shared housing. The Coopers pay $84 per month on housing and utilities. The children's pro rata share is $70 (five-sixths of $84). The administrative allowance for housing and utilities for four or more AFDC children is $101; $101 less $70 yields $31 in-kind income purportedly received by the Cooper children.

The figures throughout this opinion refer to the figures in force at the time this action was initiated. Although the figures have since been adjusted in response to cost of living increases, such changes do not affect the substantive analysis of the regulation's validity.

trative allowances and need figures and took upon itself the task of determining the minimum need level of recipients (Welf. & Inst. Code, § 11452). The Legislature itself then set *uniform welfare payments* (Welf. & Inst. Code, § 11450) *based on a fair averaging of all AFDC grants,* a method of welfare benefit computation recently approved by the United States Supreme Court in *Rosado* v. *Wyman* (1970) 397 U.S. 397 [25 L.Ed.2d 442, 90 S.Ct. 1207].[4]

The chief purposes of the reform were to streamline the administration of the welfare program[5] and to eliminate welfare paternalism by allowing recipients to allocate grant money according to their own priorities.[6] The Legislature accomplished these purposes by replacing the complicated administrative allowances with flat grants determined solely by family size, and mandating that the full grants be paid without regard to actual expenditures for particular need items. The amount received by each family is now dictated by a schedule adopted by the Legislature and contained in Welfare and Institutions Code section 11450, subdivision (a): "For each needy family which includes one or more needy children . . . there shall be paid . . . an amount of aid each month which when added to his income . . . is equal to the sums specified in the following table . . . ."[7]

---

[4] The rationale of the flat grant was aptly described by Judge Weinstein on remand of *Rosado*: "If a family's rent also covers some or all of its utilities costs, this is not now considered to reduce or eliminate its utilities need, which is included in the averaged basic amount. Rather, the family has made a good buy in shelter, just as when for the same money it gets an apartment with a washing machine, a plot to grow vegetables or a lower cost of transportation." (*Rosado* v. *Wyman* (E.D.N.Y. 1970) 322 F.Supp. 1173, 1189, affd. (2d Cir. 1970) 437 F.2d 619, affd. *sub nom. Wyman* v. *Rosado* (1971) 402 U.S. 991 [29 L.Ed.2d 157, 91 S.Ct. 2169].)

[5] The report of the Legislative Analyst projected a $5 million savings in administrative costs and no savings at all in overall grant payments. (See Analysis of the Budget Bill, Report of the Legislative Analyst to the Joint Legislative Budget Committee (1972 Reg. Sess.) p. 724 (Table 2).)

[6] The legislation operates in accordance with the "money payment" principle incorporated in the Social Security Act, 42 United States Code section 606(b); H.E.W.'s Handbook of Public Assistance Administration, section 5120; and California Welfare and Institutions Code section 10501. An eligible recipient receives his or her grant money as a matter of right; the payment is not identified with any particular requirement or requirements considered in arriving at the amount of the payment; nor is the grant money designated for any specific items or purposes. The principle guarantees the autonomy of the recipient and encourages his responsibility in budgeting his limited finances.

[7] At the time this action was commenced, the table in section 11450 established, inter alia, a flat grant figure of $115 per month for a home containing one needy eligible person, $190 for two needy persons, and $235 for three needy persons.

Unless otherwise indicated, all section references are to the Welfare and Institutions Code.

Thus, whereas under the pre-1971 practice the administrative agency was primarily responsible for establishing the basic amount of a recipient's grant, the 1971 legislation withdrew the department's authority in this regard and established a schedule of legislatively mandated "flat grants."

Subsequent to the enactment of the 1971 act, the department promulgated a series of regulations purporting to implement the reform legislation. In one of the regulations (Reg. 44-115.9), the department adopted a schedule of housing and utility "allowances," assigning a designated dollar value to housing and utilities assertedly used by different sized AFDC family units.[8] Regulation 44-115.8, the regulation at issue here, provides that whenever this administrative "allowance" figure exceeds the amount of an AFDC recipient's actual pro rata expenditure for housing and utilities, the "excess" amount shall be considered "income" to the recipient; by its terms, the regulation confines its operation to situations in which the AFDC recipient resides in the same household with one or more recipients of "adult aid."[9] Although the precise rationale of the regulation is not explicitly stated, the regulation appears to be an attempt to measure the "noncash economic benefits" which an AFDC recipient obtains by sharing housing and utilities with an individual who is receiving an independent welfare grant.

As noted above, the central issue in this case is whether Regulation 44-115.8, and more generally the entire "noncash economic benefit" concept, is compatible with the legislative scheme established by the Welfare Reform Act of 1971. As discussed below, we conclude that both the specific regulation at issue and the department's general "noncash economic benefit" theory are in direct conflict with the governing statutory provisions and cannot stand.

3. ■  *The legislative history of the Welfare Reform Act of 1971 demonstrates that Regulation 44-115.8 is incompatible with the governing statutory scheme.*

The most obvious indication that the regulation at issue here does not conform to, or implement, the governing welfare statutes appears from the legislative history of the Welfare Reform Act itself. Senate Bill No. 545 (1971 Reg. Sess.) (also known as the Burgener Bill) included a section (§ 32)

---

[8]Thus, for example, the regulation established a combined housing and utility allowance of $67 per month for one child, $87 per month for two children, and $95 per month for three children.

[9]At the time this action was commenced, there were three "adult aid" programs in California: Aid to the Totally Disabled (ATD), Aid to the Blind (AB), and Old Age Security (OAS).

requiring that part of the benefits of an ATD recipient living with an AFDC family be deemed available to the AFDC family with a consequent reduction in that family's grant.[10] The avowed purpose of this section of the bill was to eliminate a procedure which was attacked politically as providing for "double payments" to recipients of welfare benefits. Section 32, however, met with decisive defeat both in committee and on the Senate floor as a suggested amendment to the bill which ultimately was enacted as the Welfare Reform Act. (Sen. Bill No. 796 (1971) (Reg. Sess.).)[11]

Thus, while drafting the current statutory scheme, the Legislature directly considered a proposal to reduce grants of AFDC recipients sharing housing with an adult aid recipient, and it explicitly rejected such a proposal. Despite this unambiguous indicant of legislative intent, however, the department subsequently adopted the principal elements of the rejected amendment by promulgating the regulation at issue here. Not surprisingly, a legislative subcommittee has since condemned this very regulation as a blatant frustration of legislative will. (See Senate-Assembly Subcommittee on Implementation of Welfare Reform, Report to the Legislature (March 17, 1972) (Reg. Sess.) pp. 20-21.)

■ It is axiomatic, of course, that administrative regulations promulgated under the aegis of a general statutory scheme are only valid insofar as they are authorized by and consistent with the controlling statutes. "Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." (*Morris* v. *Williams* (1967) 67 Cal.2d 733, 748 [63 Cal.Rptr. 689, 433 P.2d 697]; *Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 757 [151 P.2d 233, 155 A.L.R. 405].) In promulgating the regulation in question here, the department has ignored this fundamental principle of administrative law, and has arrogated to

[10]The administration's proposed bill would have added a section to the Welfare and Institutions Code which read: "The allowable amount of aid granted pursuant to this chapter to a family which includes a recipient or recipients of [adult aid] . . . shall be determined by reducing the allowable amount of aid determined pursuant to section 11450 by an amount equal to the amount allocated to any item of the minimum basic standard of adequate care considered in determining the need of the recipient or recipients receiving [adult aid] . . . ."

[11]The Burgener Bill died in the Senate Health and Welfare Committee (see Final Calendar of Leg. Business (1971) Sen. Bill No. 545 (1971 Reg. Sess.)). The next month, section 32 was offered as an amendment to Senate Bill No. 796 and was rejected by the Senate Finance Committee. On July 21, this amendment was offered on the Senate floor and again was rejected (see 3 Sen. J. (July 21, 1971 Reg. Sess.) p. 5245 third set of amend., amend. 12). The same provision was also discussed and rejected during final negotiations on Senate Bill No. 796 which thereafter became the Welfare Reform Act of 1971.

itself the authority to reject explicit legislative determinations, an authority which is completely incompatible with the basic premise on which our democratic system of government rests.[12] Thus, the Legislature's specific rejection of the substance of the challenged regulation provides the clearest indication that the measure is not consistent with legislative intent.

4. ▮ *Regulation 44-115.8, and the entire "noncash economic benefit" concept, is in addition totally incompatible with the general principles of the governing "flat grant" system.*

Even if the Legislature had not explicitly rejected the substance of the proposed regulation, we would still conclude that Regulation 44-115.8 is invalid because it is directly at odds with the flat grant system established by the 1971 legislation. As noted above, under the flat grant system the basic amount of an AFDC grant is determined on the basis of family size. In calculating the various flat grant figures included in the schedule of section 11450, the Legislature averaged the diverse needs of *all* AFDC recipients; this averaging took into account the savings accruing to some recipients because of shared housing, as well as the many factors, such as specialized housing or utility needs, which resulted in higher housing costs for other recipients.[13] Under the flat grant approach, the resulting average figure is to be paid to all AFDC recipients *without regard to differing need.*

---

[12]In committee hearings conducted by the Legislature after the passage of the Welfare Reform Act, Department of Social Welfare Director Carleson (Swoap's predecessor) was asked to explain the department's policy of initiating regulations despite repeated rejections of the specific concept by the Legislature. The testimony follows:

Mr. Carleson: "Mr. Chairman, I say categorically on all of the questions relating to elements that proposed legislation [*sic*] that were not adopted, we have always said, we have said as clearly as we can before committees that anything we can do administratively we. will do whether or not there is legislation."

Chairman Beilenson: "Even if the regulations are specifically rejected?"

Mr. Carleson: ". . . I would say that from the standpoint of any proposed legislation by anyone that if administratively these reforms can be accomplished, we will be doing them administratively and there has been no agreement or commitment to do otherwise."

This dialogue was reprinted in the "Report to the Legislature" by the Senate-Assembly Subcommittee on Implementation of Welfare Reform, March 17, 1972, accompanied by the criticism: "Director Carleson's efforts to usurp the Legislature's policy-making authority has been a disturbing and recurring theme during the implementation of welfare reform." (Report to the Legislature, pp. 20-21.)

[13]Although the department now contends that the average figures of section 11450 were based only upon "independent" living arrangements and did not contemplate shared housing, there is absolutely nothing to support such a contention. On the contrary, it is clear that in devising section 11450's flat grant figures, the Legisla-

Because the effects of shared housing have already been considered in establishing the basic grant figures, and because the Legislature explicitly directed that reduced need cannot justify a reduced grant, it is obvious that the present regulation's reduction of AFDC housing is impermissible. Indeed, from this perspective it becomes perfectly clear why the Legislature rejected the "double payment" argument proffered in support of the Burgener Bill provision: because the savings from shared housing had already been considered in setting the flat grant figures, there was no "double payment" to be eliminated. In reality, it is the challenged regulation which would impose an unfair "double deduction" on AFDC recipients who happen to share a household with a recipient of adult aid.

Moreover, when the flat grant figure is viewed in the context of the entire prevailing welfare scheme, the invalidity of the challenged regulation becomes even clearer. The Legislature itself explicitly recognized that the flat grant payments authorized by section 11450 were not adequate to meet recipients' minimum needs; a separate provision, section 11452, sets forth a schedule of minimum needs, which in every case exceeds the flat grant payment for the corresponding family unit.

Thus, since the amount of the uniform payments consciously falls short of the *minimum need levels,* the Welfare Reform Act does not merely encourage thrift by AFDC recipients, it legislates thrift. Unless a family is able to economize in some areas of need, the statutes contemplate the failure of that family to survive. By distributing flat sums without restriction as to use, the Legislature has provided some leeway for families to meet this arduous challenge. *The legislative scheme contemplates that families will find ways to save in one area of need to help meet less flexible expenses generated by another need item.*

The "noncash economic benefit" concept devised by the department to cut welfare costs completely undermines this legislative program. Under the department's approach, whenever a recipient is successful in saving expenses in one area of need, the department asserts that it can consider such "savings" as "income" and can reduce the recipient's grant accordingly. Thus, under the instant regulation, an AFDC recipient who saves on housing costs through shared housing is "rewarded" for his thrift by a *reduction* in his welfare grant. It is not difficult to see that such an approach acts as a direct disincentive to economize; even if he can make do with less,

ture relied upon the department's past payment schedule which did not distinguish between independently housed units and AFDC units that shared housing with others. (See former Reg. 44-115.61.)

a recipient is encouraged to spend up to the full amount of the agency's arbitrary "allowance" figure. Moreover, the regulation makes it impossible for a recipient to utilize savings on housing costs to bridge the gap between his flat grant payment and his minimum needs. This consequence is another indication that both the instant regulation and the general "noncash economic benefit" concept are incompatible with the flat grant system.

5.  ■ *"Noncash economic benefits" do not constitute "income" within the meaning of section 11450.*

The department maintains, however, that the instant regulation does not conflict with the flat grant system, because the regulation represents a reasonable measure of a recipient's "income" which, under section 11450,[14] must be deducted from the flat grant figure. As we shall explain, however, the regulation's characterization of such "benefits" as "income," as well as its method of valuing such "income," is fatally flawed.

a.  *"Noncash economic benefits," and particularly "shared housing," have never been considered income in the history of California welfare programs and there is no indication that the Legislature intended to alter this approach.*

The department's contention that "noncash economic benefits," such as those involved in the instant case, constitute "income" to a recipient which justifies a reduction of his welfare grant is an entirely novel proposition. Never before in the long history of California's numerous welfare programs have such "benefits" been so designated. Indeed, with respect to the "shared housing" benefit at issue here, a pre-1971 department regulation explicitly declared that "partially free or shared living costs do not represent income." (Former Reg. 44-115.61.)

The department, however, purports to derive authority to transmute shared housing and other noncash economic benefits into deductible "income" from the language of Welfare and Institutions Code section 11008, which provides that "[i]n computing the amount of income determined to be available to support a recipient, *the value of currently used resources shall be included* . . . ." (Italics added.) As its context indicates, section 11008 undertakes to reflect only income available for the recipient's sup-

---

[14]As noted above, section 11450, subdivision (a), provides that: "[f]or each needy family which includes one or more needy children . . . there shall be paid . . . an amount of aid each month which *when added to his income* . . . is equal to the [flat grant figures] specified in the following table . . . ." (Italics added.)

port; although imprecisely stated, the "value of currently used resources" has always referred to the *income derived* from such resources. The term "resources" itself has never before referred to anything but real or personal property which a recipient may retain without forfeiting eligibility for welfare benefits.[15]

Section 11008 itself was enacted in 1965 and was re-enacted in 1971 without amendment. At no time prior to 1971, however, did the department ever assert that intangible economic benefits such as the savings derived from shared housing constitute a "resource" or "income" under section 11008 or its precursor. If in revising our state's welfare scheme in 1971, the Legislature meant to convert shared housing into income, such a radical departure from the prior practice would necessarily have been accompanied by a clear expression of legislative intent. Otherwise we must conclude that the Legislature, familiar with the long-standing administrative interpretation of income, manifested its approval by leaving the income provision of section 11008 unchanged. (See *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237 [113 Cal.Rptr. 154, 520 P.2d 970]; *Coca-Cola Co.* v. *State Bd. of Equalization* (1945) 25 Cal.2d 918 [156 P.2d 1].)

This conclusion is confirmed by the report of the Legislative Analyst evaluating the financial consequences of the 1971 welfare reform legislation. As noted earlier (see fn. 5, *supra*), the Legislative Analyst projected a $5 million savings in administrative costs but *no savings at all* in substantive grant payments. Had the Legislature intended to convert a large category of previously "non-income" benefits into deductible income, a large savings in grant payments would have been predicted. The analyst's report necessarily implies that no such transformation was intended.[16]

---

[15]An AFDC recipient may retain $600 worth of personal property (§ 11257) and an ATD, $1,200 (§ 11154). Real property is governed by sections 11153.7, 11152 and 11255. (See also §§ 11155 (additional exempt resources) and 11158.)

[16]In his dissenting opinion, my colleague Justice Burke states: "I have no difficulty characterizing as 'income' or 'resources' the actual economic benefits obtained by AFDC recipients whose living expenses are paid, in whole or in part, by other persons. . . . (*Post*, p. 874.) With all respect, I believe this statement demonstrates the numerous flaws in the dissent's argument.

First, the crucial question in this case is not whether we, as judges, or the administrative agency, can conceivably "characterize" the noncash economic benefits at issue as "income," but rather whether the Legislature intended such a characterization. Indeed, Justice Burke's recent opinion for this court in *California Welfare Rights Organization* v. *Brian* (1974) 11 Cal.3d 237 [113 Cal.Rptr. 154, 520 P.2d 970] explicitly recognizes this distinction, for while the resources of a pregnant woman's body at issue there could in some sense be characterized as "in kind income" (food, shelter) to her fetus, our court held that such a characterization was impermissible because the Legislature had not intended it. For the reasons discussed

Indeed, if the department's characterization of such benefits as deductible "income" were accepted, the practical effect would be to afford the department broad discretion to curtail almost *all* payments to AFDC recipients under the guise of "income" because the noncash economic benefits involved here are logically no different than myriad similar benefits available to all recipients. Housing and utilities represent only two of the "need" items enumerated in Welfare and Institutions Code section 11452. The department could easily assert an allowance figure for recreation and deduct from the flat grant whenever the AFDC children actually only played in a free public park or shared a television set with nonrecipients. So, too, could allowances be resurrected for food and medical supplies with consequent deductions for items shared. Yet the fact is that such sharing has always taken place. The Legislature not only knew of this practice but contemplated that such sharing would help bridge the gap between the amount of the flat grant and the recognized minimum need level. We can find no indication that the Legislature intended to permit the agency to seize upon these "economic benefits" so as to undermine the integrity of the legislatively established flat grant figure.

b. *Welfare and Institutions Code section 11006 precludes the department from treating any portion of adult aid benefits as "income" of AFDC recipients.*

Moreover, aside from the general impropriety of treating shared housing or similar benefits as "income," such characterization is clearly impermissible in the instant case by virtue of Welfare and Institutions Code section 11006. Section 11006 explicitly prohibits the imputation of any of an adult aid recipient's benefits as income to anyone else: "Aid granted *shall not be construed as income* to any person other than the recipient." (Italics added.)

---

above, it is clear that, just as in *Brian,* the Legislature did not intend the noncash economic benefits at issue in this case to be considered as deductible income warranting a reduction of a recipient's flat grant payment.

Second, the passage from the dissent quoted above, and indeed the entire dissenting opinion, erroneously assumes that the challenged regulation measures the value of living expenses of AFDC recipients actually paid for by ATD recipients residing in the same household. As I discuss below (*post,* pp. 870-871), however, the administrative regulation *never* accurately measures the value of such benefits because, by the very nature of the ATD grant, the ATD recipient never has any "excess" resources to give to the AFDC recipients. In reality, by relying upon the department's average allowance figure, the regulation only determines the AFDC recipient's "reduced need" flowing from shared housing, and, as the dissent concedes, "under the express terms of section 11450, the full AFDC grant must be paid to eligible needy persons without regard to their actual expenditure for particular need items. . . ." (*Post,* p. 877.)

It seems clear that the Legislature, in establishing this prohibition, intended to protect the full grant mandated for other welfare recipients, such as the AFDC children involved in the instant case. ■ Regulation 44-115.8, by in effect designating some portion of an adult aid recipient's housing benefits[17] as "income" to AFDC recipients residing in the same household, directly conflicts with this legislative mandate. Accordingly, on this basis alone, the regulation cannot stand.

c. ■ *In any event, the regulation is invalid because it does not measure the actual value of a recipient's benefits but instead assigns a fictional value to this asserted "income."*

Finally, even if the economic benefits of shared housing could properly be considered "income," the challenged regulation would still be invalid for it does not measure the *actual* value of a recipient's benefits but instead assigns a fictional value to such benefits. Numerous cases of the United States Supreme Court have clearly established that under the governing provisions of the federal Social Security Act only a recipient's *actual* available income may be deducted from his basic welfare benefit; arbitrary or constructive "presumptions" of income are not permissible (*Lewis* v. *Martin* (1970) 397 U.S. 552 [25 L.Ed.2d 561, 90 S.Ct. 1282]; *King* v. *Smith* (1968) 392 U.S. 309 [20 L.Ed.2d 118, 88 S.Ct. 2128]. See 42 U.S.C. § 602(a)(7); 45 C.F.R. §§ 233.20(a)(3)(ii)(c) and 233.90; Handbook of Public Assistance Administration, Part IV, § 3120 et seq.)

Under the regulation before us, a recipient's "income" from shared housing and utilities is calculated by subtracting the recipient's actual pro rata expenditure from the fixed "allowance" figure devised by the department. Thus, the regulation does not seek to determine the *actual* value of a recipient's present housing and utility resources, but instead simply presumes that every recipient's resources are equal in value to the department's average allowance figure. The *Lewis* and *King* cases cited above demonstrate the invalidity of such an approach. No matter how accurately an allowance figure may reflect the *average* cost of housing and utilities for welfare recipients throughout the state, it is still an impermissible presumption as to the value of these items received by any one recipient.[18] Only

[17]The adult aid benefits at issue are granted only to the individual adult residing in each household, *not* to a "recipient group." The suggestion to the contrary in Justice Clark's dissent is simply fallacious.

[18]The very recent United States Supreme Court decision in *Shea* v. *Vialpando* (1974) 416 U.S. 251 [40 L.Ed.2d 120, 94 S.Ct. 1746] explains that under the federal Social Security Act a recipient's income, as well as income-related expenses,

the *actual value* of housing and utilities benefits received could possibly constitute income to the recipient, and this the regulation does not measure.

Indeed, the present case provides perhaps the clearest illustration of the arbitrary manner in which the department's fixed allowance operates. At the time this action was instituted, ATD recipients such as Mrs. Cooper and Mrs. Palladino received as a housing allowance, an amount which, at most, equalled the ATD recipient's pro rata share of actual housing costs. (See former Welf. & Inst. Code, §§ 12151, 12651, 13700.) Because the ATD housing grant was limited to the recipient's pro rata share, there were never any "excess" benefits which could properly be considered as paying for part of the AFDC recipient's housing costs. Thus the nature of the ATD grant itself precluded the generation of any "income" of AFDC recipients sharing a household with an ATD recipient. Despite these economic realities, however, the regulation at issue here, by utilizing the department's fictional "allowance" figure, attributed substantial income to both the Cooper and Palladino children, improperly reducing the already meagre grants on which the children must seek to survive.[19]

must be determined on an individual, rather than an average, basis. The *Shea* court declared: "[I]t has consistently been the practice to compute the income of an AFDC applicant on an individual basis. [¶] From the inception of the Act, Congress has sought to ensure that AFDC assistance is provided only to needy families, and that the amount of assistance actually paid is based on the amount needed in the *individual* [original italics] case after other income and resources are considered. . . . For example, HEW's broad definition of 'earned income' . . . demonstrate[s] its view that the determination of need in such case *is to be based upon an amount of the particular individual's available income and resources.* [Italics added.] . . . Thus if income and expenses related to the production of income are to be treated alike . . . both must be considered on an individualized basis." (Fn. omitted.) (416 U.S. at pp. 260-262 [40 L.Ed.2d at pp. 129-130].) Pursuant to this analysis the *Shea* court invalidated a state welfare provision which limited a recipient's "work-related expenses" to an average, standardized figure.

[19]Justice Clark's dissent rests entirely upon the totally erroneous premise that the "noncash economic benefit" concept underlying the challenged regulation is equivalent to "in-kind income." As we have explained, however, unlike true "in-kind income," the department's "economic benefit" concept does not reflect *actual* income (commodities or cash) received by a recipient, but instead attributes "constructive" income to a recipient who, through such economizing conduct as sharing housing, manages to spend less money monthly than the department's hypothesized average. A recipient who saves on housing costs by sharing a household with others, and who in the department's eyes thereby realizes "noncash economic benefits," is a far cry from a recipient who receives free housing (i.e., actual "in-kind income") or cash from a willing and able donor. (See *Waits* v. *Swoap, supra, post,* p. 887, fn. 6.) Accordingly, the dissent's reliance on federal and state provisions concerning actual "in-kind" income is misplaced. In short, Justice Clark simply fails to comprehend the regulation's serious distortion of the "in-kind income" concept. Furthermore, the scattered and random allegations of "misstatements" ascribed to the majority opinion by Justice Clark are neither borne out by the record nor worthy of refutation.

6. *Conclusion.*

To reiterate, we have concluded that the regulation at issue is incompatible with the governing statutory provisions and therefore invalid. As we have seen, the Legislature, in drafting the Welfare Reform Act of 1971, explicitly rejected a provision identical in substance to the proposed regulation; we have also explained that such rejection was quite predictable in view of the fact that the "noncash economic benefit" concept on which the instant regulation rests is itself completely at odds with the flat grant system adopted by the 1971 legislation. Although the department defends the regulation as a proper measure of deductible income, we have demonstrated that such a characterization flies in the face of established practice as well as the explicit provisions of Welfare and Institutions Code section 11006. Finally, we have demonstrated that, in any event, the department's abstract "allowance" figures constitute an impermissible measure of income for they fail to measure the actual value of benefits received by any recipient.

The department's desire to cut welfare expenses at any cost has led it to disregard the clear guidelines of its legislative mandate and to construct a contrived and tortured concept of "income" in an attempt to camouflage an impermissible administrative reevaluation of AFDC recipient's needs. An analysis of the complexities of the department's novel determination of "income" is reminiscent of a journey into the fictional realms visited by Alice through the looking glass. In the fanciful world of Lewis Carroll, the inhabitants could turn fact into fiction and fiction into fact by mere ipse dixit. As Humpty Dumpty scornfully informed Alice, "When I use a word, it means just what I choose it to mean—neither more nor less."

"The question is," said Alice, "whether you can make words mean so many different things."

"The question is," said Humpty Dumpty, "which is to be master—that's all."

Like Humpty Dumpty, the department confronts us with the question "which is to be master"—the department or the Legislature? The department's position is as precarious and untenable as Humpty's seat on the wall.

"Through the Looking-Glass" dealt with a fictional child. The tragedy of the instant case is that the department's regulation, born of a fictional "allowance" construct, has brought all-too-real hardships to very real children. An administration of the welfare program that discards statutory mandate to reduce relief to the indigent young cannot be sustained. A

society that sacrifices the health and well-being of its young upon the false altar of economy endangers its own future, and, indeed, its own survival.

We conclude that Regulation 44-115.8 is invalid. The judgment is reversed and the case remanded to the superior court for further proceedings consistent with the views expressed herein.

Wright, C. J., Mosk, J., and Sullivan, J., concurred.

**BURKE, J.**—I dissent. The solution of this case and its companion, *Waits v. Swoap, post,* page 887 [115 Cal.Rptr. 21, 524 P.2d 117], simply requires the application of common sense. The Legislature, acting pursuant to the mandate of federal law,[1] has specified that the amount of a welfare grant payable to an AFDC recipient must be reduced by the amount of any "income" or "resources" available to him. (Welf. & Inst. Code, §§ 11450, subd. (a), 11008.) For example, if an aid recipient regularly receives $50 in cash each month from a friend or relative, that amount must be deducted from his grant—the majority presumably would concede this is so. The obvious reason for requiring the deduction of "income" or "resources" from a recipient's grant is to assure that the state's limited welfare funds are allocated only to those who truly are in need of aid. It seems unquestionable to me that this is a legitimate, rational state interest which must be given effect by the Department of Social Welfare and this court.

The Legislature, however, has made no attempt to define the term "income," other than to state that it includes "the value of currently used resources." (Welf. & Inst. Code, § 11008.) Instead, the Legislature has entrusted the department (not this court) with the task of establishing regulations "not in conflict with the law" which fix statewide standards for the administration of all state or federally assisted aid programs. (*Id.,* § 10604, subd. (b)), and which "implement, interpret, or make specific" the applicable statutory provisions (*id.,* § 10554). Accordingly, the department has enacted various regulations designed at defining and implementing the broad terms "income" and "resources" used by the Legislature.

---

[1]Under federal law, a state AFDC plan must take into consideration any nonexempt income and resources of an aid recipient. (42 U.S.C. § 602, subd. (a), subsec. (7).) HEW regulations implementing this provision state that "only such net income as is actually available for current use on a regular basis will be considered, and only currently available resources will be considered . . ." in establishing eligibility and the amount of the assistance payment. (45 C.F.R. § 233.20, subd. (a), subsec. (3)(ii)(c).)

These regulations acknowledge the undisputed economic fact that a person has "income" or "resources" when he receives *something of value* besides cash, something which gives him a financial advantage over another and reduces his economic needs. (See, e.g., Treas. Reg. 1.61-1(a).) Thus, Regulation 44-101 defines "income" as any benefit in cash *or in kind* which is in fact available to the individual, and Regulation 44-101.8 defines "in-kind income" as any benefit received other than in cash, including the value of need items provided at no charge. And Regulation 44-115.9 sets forth the department's estimated in-kind income value of housing, utilities, food and clothing furnished to an aid recipient, for purposes of fixing uniform values for such need items.[2]

In *Waits* v. *Swoap, supra, post,* page 887, the "something of value" sought to be taken into consideration by the department was *free housing* regularly furnished to children living with nonneedy relatives. In the instant case, what is involved is *reduced housing expense* attributable to a shared expenses arrangement with other welfare recipients. In both cases, as in the hypothetical case involving a regular $50 cash gift, aid recipients are receiving economic benefits which directly reduce their cost of living and which, under any rational system, should be taken into consideration in determining the size of the assistance grant. The majority's refusal to acknowledge that noncash economic benefits such as free or reduced rent constitute "income" underscores the appropriateness of their reliance (*ante,* p. 871) upon Humpty Dumpty's admonition to Alice that "When I use a word, it means just what I choose it to mean—neither more nor less." In my view, "income" is realized in all three situations, and our only concern should be to assure that the department's regulations accurately calculate the amount of income to be deducted from the grant in each situation.

As indicated above, I have no difficulty characterizing as "income" or "resources" the actual economic benefits obtained by AFDC recipients whose living expenses are paid, in whole or in part, by other persons, including  recipients of other categorical aid. For example if an AFDC

---

[2]Contrary to the majority, these figures are neither "fictitious" nor "arbitrary." Instead, they represent the department's estimates of actual value, based upon actual costs developed by a 1970 survey and prorated on the basis of the total maximum aid payments specified in section 11450, subdivision (a) of the Welfare and Institutions Code. Thus, of the total maximum AFDC aid of $117 per month available for one needy person under section 11450, the department has allocated $55 for housing, $12 for utilities, $29 for food and $9 for clothing. (The remaining $12 presumably represents incidental items not included for purposes of evaluating in-kind income.) Certainly, the department is entitled, for purposes of administrative convenience, to make a reasonable, uniform estimate of the value of need items furnished to aid recipients, and plaintiffs have not asserted that these figures are unreasonably large.

family subleased a room in their home for $50 a month, unquestionably some, if not all, of that amount could be considered "income" which could be deducted from the AFDC grant. In the instant case, the AFDC recipient family members share housing and utilities expenses with recipients of "adult aid," thereby presumably reducing the amount of funds the former recipients otherwise would require to meet these expenses. Since AFDC recipients living with recipients of adult aid constitute a general class of persons who have economic advantages which other AFDC recipients do not have, the department properly may characterize this economic advantage as a "resource" for purposes of computing the grant.[3]

The majority, disputing that "resources" or "income" exist in this situation, claim that under California's present "flat grant" system whereby aid is paid to needy persons in accordance with a table of maximum grants without regard to individual recipient needs (Welf. & Inst. Code, § 11450), the Legislature has already considered and "averaged" into these grant figures possible shared housing arrangements. The majority assert that since the Legislature has taken into account such arrangements in computing the maximum grants, the department's regulation in effect accomplishes a double reduction in grant size. On the other hand, the department disputes the assertion that the Legislature considered shared housing arrangements; according to the department, it is more likely that the maximum grant schedules were prepared on the assumption of "independent living arrangements." Although the legislative history is inconclusive on the question, I think it is significant that the Legislature expressly required that "income" (defined to include "resources" under § 11008) be deducted from the maximum grant figure, without attempting to narrow the scope of the quoted terms, and without expressly excluding such income-generating devices as shared housing.

Thus, the United States Supreme Court has recently noted that, "From the inception of the Act, Congress has sought to ensure that AFDC assistance is provided only to needy families, and that the amount of assistance actually paid is based on the amount needed in the *individual* case after other income and resources are considered. Congress has been careful

---

[3]Principles of equal protection would not prohibit the state, in allocating its limited welfare funds, from drawing rational distinctions based upon the differing needs of various classes of recipients and adjusting the size of its grant payments accordingly. As stated in *Jefferson* v. *Hackney,* 406 U.S. 535, 546-547 [32 L.Ed.2d 285, 296, 92 S.Ct. 1724], "[s]o long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straightjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them."

to ensure that *all* of the income and resources properly attributable to a particular applicant be taken into account, and this individualized approach has been reflected in the implementing regulations." (Fn. omitted, *Shea* v. *Vialpando,* 416 U.S. 251, 261 [40 L.Ed.2d 120, 129-130, 94 S.Ct. 1746].)

The majority rely upon language in section 11006 of the Welfare and Institutions Code that money paid to an aid recipient "is not for the benefit of any other person," and "shall not be construed as income to any person other than the recipient. . . ." Yet the challenged regulation does not assume that any part of the grant paid to a recipient of adult aid constitutes income to the AFDC recipient family members; the regulation, properly construed, only comes into play when grant funds are subsequently *used* by the adult aid recipient to pay housing and utilities expenses which otherwise the AFDC recipients would be required to meet.

For example, assume that an ATD recipient actually gave $50 of his aid funds to assist an AFDC family in meeting their own expenses. Clearly, that amount properly could be considered "income" or a "resource" of the AFDC family, and deducted from the AFDC grant, despite the origin of those funds. Similarly, when an ATD recipient contributes a portion of ATD funds in a shared expenses arrangement with an AFDC family, it seems reasonable to consider at least part of the contribution a "resource" of the AFDC family, *if* the contribution results in an actual savings to that family.

Finally, the majority overlook the evident implication of section 11010 of the Welfare and Institutions Code that the department properly may consider, in determining the amount of the AFDC assistance grant, voluntary contributions or grants from "public sources, private agencies, friends or relatives" if the service to be provided by such contributions or grants (such as housing and utilities expenses) are covered by an AFDC assistance allowance. Housing and utilities are needs which are included within the AFDC assistance allowance (Welf. & Inst. Code, § 11452).

I would hold, therefore, that the department had the authority to assign a reasonable value to the "resource" created by a shared expenses arrangement.[4] On the other hand, it appears that, in certain of its applications, the

---

[4]The majority also point out that (1) at some time prior to 1971 the department had adopted a regulation, now repealed, to the effect that shared living costs do not represent "income" to an aid recipient, and (2) in 1971 the Legislature failed to pass proposed legislation (the so-called "Burgener Bill") to reduce the grant to AFDC families residing with adult aid recipients. Similar factors led us to invalidate an

department's regulation may result in an impermissible overvaluation of that resource. Referring to the facts in the instant case, apparently Mrs. Cooper's actual contribution to the family's housing expenses was only $14, yet the regulation required a grant deduction of $31. It seems evident that "income" or "resources" in the amount of $31 could not have been generated by a $14 contribution, and that accordingly the regulation's formula has substantially overvalued the "resource" available to the AFDC recipients by reason of the shared expenses arrangement. A simple calculation will verify that such overvaluation occurs only when the AFDC recipients' hypothetical "allowance" for housing and utilities expenses exceeds the total amount paid by the combined ATD-AFDC family for these items.

In reality, therefore, Regulation 44-115.8 may operate to penalize an AFDC family for its thrift and its ability to spend less AFDC funds for housing and utilities than the department has allocated to it for these items. In other words, at least part of the grant reduction may be attributable to the family's reduced spending, rather than the existence of "income" or "resources." Yet, under the express terms of section 11450, the full AFDC grant must be paid to eligible needy persons, without regard to their actual expenditures for particular need items; the department's sole authority for making a deduction from that grant would be the existence of "income" or "resources." Therefore, in order to comply with state statutory provisions, under no circumstances should the amount of the grant reduction exceed the amount actually contributed by the adult aid recipient to defray the AFDC recipients' expenses.

It is arguable, of course, that Mrs. Cooper's situation is not typical, and that ordinarily an AFDC-ATD family will be unable to obtain housing at a cost substantially lower than the department's "allowance," which itself is an estimate of the *minimum* necessary to fulfill that need. For example, had the Cooper family spent $102 per month, rather than $84, on housing and utilities, the grant reduction ($16) would not exceed the amount ($17)

---

"in-kind income" regulation which would have reduced the AFDC grant to pregnant mothers. (*California Welfare Rights Organization* v. *Brian,* 11 Cal.3d 237 [113 Cal. Rptr. 154, 520 P.2d 970].) In *Brian,* however, the department had formerly adopted a long-standing and controversial administrative policy of treating the unborn child as a "person" for purposes of computing the AFDC grant; the Legislature's repeated refusals to reverse this long-standing policy confirmed our conclusion that the department's new regulation (treating the mother's body as a "resource" of the fetus) violated probable legislative intent. The instant case involves no abrupt change of long-standing policy, and the defeat of the "Burgener Bill" is not conclusive evidence of a contrary state policy, given the existing legislative mandate to consider "income" and "resources" of an aid recipient (Welf. & Inst. Code, §§ 11008, 11450).

contributed by Mrs. Cooper from ATD funds as her one-sixth share of actual cost.[5]

Yet even in a situation wherein the grant deduction does not exceed the amount contributed by the adult aid recipient, the regulation may overvalue the "resource" derived from shared expenses. The department has argued that "All these regulations do is recognize the economies of scale, i.e., the more individuals that reside in a given living unit the lower the per individual cost. [¶] Or to phrase it in its most familiar terms, 'two can live as cheaply as one.' *Strictly speaking this bromide is not wholly accurate,* but 'economies of scale' is a valid description of the realities at the heart of the cost of living." (Italics added.) The reason, of course, why the "bromide" is inaccurate in a shared housing situation is that the presence in the home of an additional "cost-sharer" such as Mrs. Cooper might well *increase* the costs which must be shared; the presence of an additional person could require a larger house at a higher rent, and could lead to increased utilities expense as well. (See *People* v. *Gilbert,* 1 Cal.3d 475, 478, fn. 1 [82 Cal. Rptr. 724, 462 P.2d 580].) Thus, it is not necessarily reasonable to assume that the entire contribution of an adult aid recipient toward shared expenses constitutes a "resource" of the AFDC recipient members—some allowance reasonably should be made to account for any increased costs attributable to the shared expenses arrangement.[6] Yet, unlike the regulation involved in *Waits* v. *Swoap, post* (dependent children living with nonneedy relatives), the instant regulation makes no express provision for a showing of such increased costs.[7]

---

[5]Under Regulation 44-115.8, the Cooper children's five-sixth share of the $102 monthly expense would be $85. As the department's "allowance" for such expenses is $101 for five persons, the difference ($16) would be deducted from the AFDC grant.

[6]The *Gilbert* case, *supra,* supports this view. In *Gilbert,* defendant was charged with fraudulently obtaining excess AFDC aid, based on the fact that she failed to report certain contributions made to her by one Branch, who lived with her. We noted that, under the department's own regulations, "To be considered in determining the AFDC payment, income must, in fact, be currently available to needy members of the family in meeting their needs during the budget period." (Reg. 44-101.) Accordingly, we noted that "Branch's presence in the household had forced defendant to move to a larger, more expensive apartment. Since defendant's share of the rent at the new apartment almost equalled her rent at the old apartment, Branch's 'contribution' to the rent afforded no income to defendant, but was payment by Branch of an additional expense incurred by defendant on his behalf." (1 Cal.3d at p. 478, fn. 1.)

[7]In *Waits,* the department's regulations assume that the entire contribution by nonneedy relatives of housing and utilities (valued by the department's "allowance" tables in Reg. 44-115.9) should be deducted from the AFDC grant to dependent children in the care of those relatives, but additionally permitted the relatives a credit against the reduction for any increased costs attributable to the child's presence in their home. (Reg. 44-115.611.)

Thus, I would conclude that plaintiffs have established that, as applied to certain families, the regulation at issue may overvalue the resource of shared housing. On the other hand, it seems evident that, as applied to many families, the regulation will not result in an improper evaluation. As a general rule, the same principles of construction which apply to statutes likewise govern the construction of administrative rules and regulations. (*Cal. Drive-in Restaurant Assn.* v. *Clark,* 22 Cal.2d 287, 292 [140 P.2d 657, 147 A.L.R. 1028].) One such principle is that, to the extent possible, we must give effect to a statute, "and the fact that it may not be possible to give it effect in one class of cases is no reason for not giving it effect in other cases where it is possible." (*Hodge* v. *McCall,* 185 Cal. 330, 335 [197 P. 86].) A statute or regulation may be invalid as applied to one set of facts, yet valid as applied to another. (*Ferrante* v. *Fish & Game Commission,* 29 Cal.2d 365, 373 [175 P.2d 222].) I believe it would be proper, in the instant case, to sustain Regulation 44-115.8 to the extent it does not result in an improper overvaluation of the resource in question.

Accordingly, I would hold that Regulation 44-115.8 is valid on its face but may not be applied in such a manner as to achieve a reduction of the AFDC grant in excess of the net contribution of the adult aid recipient family member. By "net contribution," I mean the actual cash contribution to housing and utilities expenses less any increased housing and utilities costs attributable to the presence of the adult aid recipient in the home.[8] For example, in Mrs. Cooper's case, the AFDC grant reduction would be limited to $14, assuming that the evidence discloses that this was the amount of her actual contribution toward housing and utilities. The Cooper family would have the opportunity of showing that Mrs. Cooper's presence in the home resulted in increased housing and utilities expenses which justify an appropriate credit to the $14 grant deduction.

McComb, J., concurred.

**CLARK, J.**—While I concur in Justice Burke's dissent and its "application of common sense," I feel compelled to further respond to unfortunate statements in the majority's opinion.

The issue of this case is whether in-kind income—or noncash economic benefits—are to be considered as income which will be applied in computing

---

[8]As I suggested in my dissent in *Waits* v. *Swoap, supra, post,* pages 901-902, it is reasonable to place the burden of establishing such increased costs upon the aid recipients themselves, rather than upon the department, since such information is more readily available to them. (See also *People* v. *Gilbert, supra,* 1 Cal.3d 475, 484, and fn. 14.)

a welfare grant and whether all of the resources furnished to the multi-grant household may be considered in determining the family needs from government.[1] In discussing these issues, the majority not only ignores and misinterprets applicable law but also makes several factual errors.

Exemplifying the majority's misunderstanding of the factual setting, the opinion indicates (*ante,* p. 861) that at the time of the Welfare Reform Act of 1971, a regulation (44-115.61) was in effect "which expressly declared that 'partially free or shared living costs *do not represent income.*' (Italics added.)" Actually, this regulation was revoked on 1 June 1969, more than two years before welfare reform. A succeeding version of the regulation was revoked on 1 July 1970, and the concept abandoned.[2] The majority also states that noncash economic benefits "have never been considered income throughout the entire history of California's welfare system, and we can find absolutely no indication that the Legislature intended to alter its consistent treatment of such 'benefits.' " (*Ante,* pp. 859-860.) In fact, in-kind income had long before the enactment of the Welfare Reform Act been recognized as income not only by the Department of Social Welfare,[3] but also by the Legislature in section 11009.1 of the Welfare and Institutions Code.[4]

The Legislature at the time of the enactment of welfare reform was undoubtedly aware of the department's existing policy of subtracting income

---

[1]Regulation 44-115.8, challenged in this case, provides that when one or more recipients of AFDC reside in the same household with one or more recipients of adult aids, if the recipient's (either adult aid or AFDC) housing and utilities allowance exceeds his share of the actual cost of housing and utilities (including telephone), the excess shall be considered in-kind income and be taken into consideration in computing the grant. Each recipient's share shall be calculated by dividing the total actual cost of housing and utilities (including telephone) by the number of persons (adults and minors, needy and nonneedy) residing in the household.

[2]For a helpful discussion of the administrative, legislative, and litigative history of California's welfare reform program, see Zumbrun, Momboisse and Findley, *Welfare Reform: California Meets the Challenge* (1973) 4 Pacific L.J. 739, relied on throughout this opinion. The authors are members of the Pacific Legal Foundation, a nonprofit, public interest legal firm recently founded in Sacramento. Pacific Law Journal (University of the Pacific (McGeorge School of Law)) specializes in the analysis of significant California legislation.

[3]Section 44-115 of Manual of Policies and Procedures preserves the treatment of in-kind income. That section can be traced to a regulation in effect in 1963.

[4]Section 11009.1 states: "The value of free board and lodging supplied to a recipient during a temporary absence from his home of not more than one month, shall be considered an inconsequential resource and shall not be deducted from the amount of aid to which the recipient is otherwise entitled. [¶] After an absence of one month, free board and lodging shall be considered income to the extent the value exceeds the continuing cost to the recipient of maintaining the home to which he expects to return."

—in cash or kind—from the standard to obtain payment level. That the Legislature did nothing to attempt to change this ongoing policy of deducting income in cash and kind, but instead wrote it into the flat grant statute (Welf. & Inst. Code, § 11450, subd. (a)) reasonably evidences a legislative intent to retain the policy.

With regard to legislative intent, the majority opinion states (*ante,* p. 863): "The most obvious indication that the regulation at issue here does not conform to, or implement, the governing welfare statutes appears from the legislative history of the Welfare Reform Act itself."

The majority then discusses Senate Bill No. 545 (1971 Reg. Sess.) and particularly section 32.[5] Heavy reliance is placed on the fact that section 32 was not enacted into law. The majority then concludes that because the Legislature rejected section 32, it rejected the noncash economic benefit theory and the principle underlying Regulation 44-115.8.

*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.* (1968) 263 Cal.App.2d 41, 57-58 [69 Cal.Rptr. 480], holds that unpassed bills relating to an act already in effect have little value as evidence of legislative intent. Indeed, it is improper for the majority here to isolate section 32 of Senate Bill No. 545 to glean legislative intent when it is considered that the entire bill failed to meet the legislative approval, and Senate Bill No. 796, which we consider today, was finally enacted into law. (No inference is drawn from this fact, however, and logically so, that welfare reform in general was rejected by the Legislature, yet the same reasoning is applied to section 32.)

The majority emphasizes that section 32 was reconsidered as an amendment to Senate Bill No. 796 at least twice and was discussed and rejected during negotiations on this bill, which thereafter became the Welfare Reform Act of 1971.[6] This reconsideration, apart from Senate Bill 545, the majority states is an "unambiguous indicant of legislative intent" whereupon it is concluded that the regulation in question, similar in substance to section 32, is inconsistent with legislative intent.[7]

Failure to adopt section 32 does not necessarily signify rejection of the underlying principle. It is common knowledge that legislative acts are often

---

[5]Section 32 of Senate Bill No. 545 provided for reductions in aid when there is a shared living arrangement between an AFDC recipient and recipients of the former adult aid welfare programs.

[6]Majority opinion, *ante,* page 864, footnote 11.

[7]*Ibid.,* page 868, footnote 15.

borne out of compromise and necessity. With regard to necessity, it has been pointed out here that the Legislature had knowledge of the department's pre-welfare reform treatment of in-kind income. The rejection of section 32 could thus be seen as acquiescence in the department's treatment of in-kind income and the director's interpretation of pre-welfare reform law authorizing such in-kind income deductions. That the concepts underlying section 32 were already embodied in existing law and practice is a more logical basis for explaining the failure of section 32 to be enacted into law. In any event, the majority emphasis on section 32 is entirely misplaced.

While it is evident the majority misunderstands the history behind in-kind income statutes, it is also evident the opinion suffers from a basic misunderstanding of the present and pre-reform systems in general. The welfare system has always made a sharp distinction between *need* and *income*. Prior to the adoption of the Welfare Reform Act, the former Department of Social Welfare utilized a schedule of coded AFDC costs whereby each specific need of every member of the family budget unit had to be identified and aggregated. Total aid payments were limited, however, by a statutory maximum which varied depending on the number of needy children in the home. (Welf. & Inst. Code, § 11450, subd. (a).)

With the enactment of the Welfare Reform Act, the California Legislature changed to a flat grant aid system whereby, rather than aggregating each specific need, a statutory grant schedule was provided which varied depending on the number of eligible needy persons in the family. Recognized income, including currently used resources, would be subtracted from the new grant schedule in determining the actual cash payment. (Welf. & Inst. Code, §§ 11008, 11450, subd. (a).)

When the Legislature averaged out need, it by no means required the department to pay the same amount of grant to all recipients having the same size family. On the contrary, it specifically required the department to continue its existing practice of considering the recipient's income, in cash or kind, and deducting it from the standard to obtain grant level.

Thus, although need was determined with reference to a flat grant schedule of average needs instead of an aggregation of individual needs, the amount of the welfare grant has consistently reflected income of the recipient.

In the welfare context, then, income, whether in-kind or cash, does not have the effect of reducing *need*—it reduces the *amount* of the welfare

grant. This is evidenced in the language of the flat grant statute which provides in pertinent part: ". . . [T]here shall be paid . . . an amount of aid each month which *when added to his income* . . . is equal to the sums specified in the following table, . . ." (Welf. & Inst. Code, § 11450, subd. (a); italics added.) The majority therefore is in serious error (*ante,* p. 859) when it states that ". . . the Legislature took it upon itself to set fixed grant levels to be paid to *all* recipients without regard to individual need."

Additional error in the majority opinion is seen in the discussion of the maximum payment standard established by section 11450, subdivision (a), as contrasted to the higher minimum basic standard of adequate care established in section 11452. In melodramatic fashion it is stated: "Thus, since the amount of the uniform payments consciously falls short of the *minimum need levels,* the Welfare Reform Act does not merely encourage thrift by AFDC recipients, it legislates thrift. Unless a family is able to economize in some areas of need, the statutes contemplate the failure of that family to survive." (*Ante,* p. 866.)

This statement overlooks the fact that the difference between maximum aid (§ 11450) and minimum basic standards of adequate care (§ 11452) was in no way meant to coerce families into shared living arrangements. Instead, the Legislature set to establish the difference as the bonus value of food stamps.[8] The formula was that grant plus income, plus the bonus value of food stamps, equals minimum basic standard of adequate care. And in order that there would never be any failure of a family to "survive" because of a maximum aid level lower than need, the Legislature provided (Welf. & Inst. Code, § 11453.1) that in the event federal law was amended so as to preclude food stamp benefits to welfare recipients, the bonus value of food stamps would be paid to a recipient family in addition to its maximum aid grant. In other words, the Legislature guaranteed welfare recipients that their full needs would be met either by a combination of grant plus food stamps or, if food stamps were abolished, by increasing the grant by the bonus value of food stamps.

Significantly, recognition of in-kind income is required both by state and federal law. The majority states (*ante,* p. 867) that " 'noncash economic benefits' do not constitute 'income' within the meaning of section 11450," but if they do not, then section 11450 does not conform with the rest of state and federal law. Welfare and Institutions Code section 11009.1 specifically requires the consideration of in-kind income or noncash economic benefits in the form of free board or lodging except when of a temporary

---

[8]Zumbrun, Momboisse and Findley, *Welfare Reform: California Meets the Challenge* (1973) 4 Pacific L.J. 739, 748-749.

nature. The court's unwarranted interpretation of section 11450 would silently overrule the mandate of section 11009.1.

Moreover, misapplication of state law is particularly noticeable in the majority opinion in the edited reliance on section 11006. The majority quotes this section as providing: " 'Aid granted *shall not be construed as income* to any person other than the recipient.' " Although the majority's punctuation would lead one to believe that this is a complete quotation, it is not. The entire sentence in the section reads: "Aid granted shall not be construed as income to any person other than the recipient *or, in the case of a recipient group, the recipient group.*" (Italics indicate portion of sentence omitted by majority.)

The significance of the omitted portion is of direct relevance because this case deals with a recipient group—specifically a family some of whom are recipients of AFDC and some of whom are recipients of an adult category of aid. Thus, section 11006 not only does not prohibit attributing aid as income to the members of a multi-category recipient group, such as the Cooper family; it contemplates such attribution in specific language.

In addition, section 11008 requires that, in computing the amount of income determined to be available to support a recipient, the value of currently used resources shall be included.

These state statutes comply with federal law (42 U.S.C. § 602(a)(7)) requiring the state, in determining the amount of a welfare recipient's need, to take into consideration any income or resource of any child or relative claiming AFDC eligibility. The majority's decision will cast doubt on provisions of the Social Security Act itself and open a Pandora's box for welfare recipients.

The majority holding that "noncash economic benefits" do not constitute "income" within the meaning of section 11450 would exclude a portion of the recipient's income that is required to be considered under federal law. Such a result is in total disregard of the requirements of federal law and places the state's welfare plan in jeopardy.[9] Rather than to place the

---

[9]Welfare and Institutions Code section 11003 provides: "If the United States Department of Health, Education, and Welfare issues a formal ruling that any section of this code relating to public assistance cannot be given effect without causing this state's plan to be out of conformity with federal requirements, the section shall become inoperative to the extent that it is not in conformity with federal requirements."

state in such predicament, this court should adopt the only logical conclusion—that income in-kind is income in fact, and that both state and federal law require it to be considered as such.[10]

The majority states (*ante,* p. 870) that "a recipient's 'income' from shared housing and utilities is calculated by subtracting the recipient's actual pro rata expenditure from the fixed 'allowance' figure devised by the department. Thus, the regulation does not seek to determine the *actual* value of a recipient's present housing and utility resources, but instead simply presumes that every recipient's resources are equal in value to the department's average allowance figure."

This criticism would be justified if the department determined the pro rata share by dividing the average or standard of housing and utilities cost by the number of persons in the recipient group. However, by dividing the "total *actual* cost of housing and utilities" (Reg. 44-115.82; italics added), there is no arbitrary or constructive "presumption" of income of the type alluded to in *Lewis* v. *Martin* (1970) 397 U.S. 552 [25 L.Ed.2d 561, 90 S.Ct. 1282] or *King* v. *Smith* (1968) 392 U.S. 309 [20 L.Ed.2d 1118, 88 S.Ct. 2128]. The use of actual cost of housing and utilities in the formula provides for an individualized determination of income in each case.[11]

Furthermore, state law provides that the director is the only person authorized to adopt regulations to implement, interpret or make specific the law enacted by the department.[12] It must be realized that the defendant not only has the authority, but has the duty to adopt regulations to implement or interpret the laws administered by him. In effect, the defendant is mandated by statute to establish the value of currently used resources. The method of computing the value of this in-kind income is a question for the defendant as the Director of the Department of Social Welfare. Pursuant to the proper exercise of his authority, the director amended Regu-

[10]The pervasiveness of the concept of in-kind income in the welfare system is exemplified in the recent federalization of the adult aid program. Section 1612(a)(2) of the Social Security Act (42 U.S.C. § 1382a(a)(2)) defines unearned income as including ". . . support and maintenance furnished in cash or kind. . . ." and specifies a formula for computing the value to a recipient of a shared living arrangement. The majority should note that this definition of in-kind income is also applied in the context of a flat grant program.

[11]Justice Burke aptly points out in his dissenting opinion (*ante,* p. 874, fn. 2) the allowance figure is neither "fictitious" nor "arbitrary." The values assigned represent the department's estimates of actual value, based upon actual costs developed with reference to a 1970 survey and prorated on the basis of the total maximum aid payments specified in section 11450, subdivision (a), of the Welfare and Institutions Code.

[12]Welfare and Institutions Code section 10554.

lation 44-115.8 to implement, interpret, and make specific the application of section 11008 to multi-grant households.

The principle is well-established that courts will not ordinarily overturn the quasi-legislative acts of an administrative agency which are not clearly arbitrary or capricious. (*Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 179 [70 Cal.Rptr. 407, 444 P.2d 79]; *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83].) In view of the longstanding practice of the department, acquiesced in by the Legislature, this court should be hesitant to interfere with the policies of the other branches of government.

The California Constitution makes this court the final authority on matters of state law. (Cal. Const., art. VI, § 1.) Yet, as to matters of administrative policy we should act circumspectly. In the words of the United States Supreme Court: "The Constitution may impose certain procedural safeguards upon systems of welfare administration. [Citation omitted.] But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 487 [25 L.Ed.2d 491, 503, 90 S.Ct. 1153].)

I cannot concur with the majority of this court who would preclude the Director of Welfare from utilizing common sense in providing an equitable distribution of California's limited welfare funds to needy recipients.

On July 19, 1974, the opinion was modified to read as printed above. Respondent's petition for a rehearing was denied August 7, 1974. McComb, J., Burke, J., and Clark, J., were of the opinion that the petition should be granted.