[L.A. No. 31620. Apr. 20, 1984.]

BERNADETTE DARCES, Plaintiff and Appellant, v.
MARION WOODS, as Director, etc., Defendant and Respondent.

## COUNSEL

Hugh Harrison, Erica Hahn, Byron J. Gross, Edward Ortega, Marilyn Kaplan Katz and Melinda Bird for Plaintiff and Appellant.

John Huerta, Linda Wong, Richard Pearl, Stefan Rosensweig, Christine Hely, Mark Rosenbaum, Peter Reid and Peter A. Schey as Amici Curiae on behalf of Plaintiff and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman and Elizabeth Hong, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**REYNOSO, J.—** May the state disadvantage citizen children eligible for governmental assistance on the basis that they live with their brothers

and sisters who are undocumented aliens? We hold that the equal protection clause of the California Constitution does not permit that disparate treatment.

Bernadette Obando Darces is an undocumented alien and working mother whose income is insufficient to meet the subsistence needs of her six children, three of whom are native-born citizens. Her three older children—Marisol, Pablo and Carlos—are ineligible for assistance under the Aid to Families With Dependent Children (AFDC)[1] program because of their undocumented immigration status. However, her three younger children—Larry, Jorge and Guido—as citizens are eligible to be, and were in fact recipients of an AFDC grant at the time this litigation was instituted.

This case concerns a decision by defendant Marion Woods, as director of the State Department of Social Services (DSS), reducing the grant received by Ms. Darces for the benefit of her three citizen children. In particular we consider the validity, under state and federal law, of administrative regulations which authorize DSS to assume that Ms. Darces' total income is available only to the citizen children without taking into account the fact that a portion of her earned income must of necessity be allocated to meet the needs of her other children.

The department's policy and practice, Mrs. Darces complains, deny her citizen children the minimum grant amount the state has determined is necessary to prevent deprivation—the amount provided to all other eligible children. She asks this court to recognize that the policies of the department and the state clash with the daily reality confronting her family, and urges us to hold that DSS cannot employ the presumption that all of her income is available to the citizen children. After all, she argues, she has a moral and statutory obligation to feed, clothe and house her three undocumented children. Her arguments, in essence, coalesce into a basic contention that the state may not punish and severely disadvantage her citizen children who, by accident of birth, must live under the same roof as their undocumented brothers and sisters. She advances both statutory and constitutional arguments in support of this position.

Ms. Darces first contends that the challenged policy and practice are inconsistent with the applicable state and federal laws governing administra-

---

[1] For convenience we list the principal abbreviations necessary for this opinion.
1. AFDC—Aid to Families With Dependent Children
2. DSS—State Department of Social Services
3. EAS—Eligibility and Assistance Standard
4. FBU—Family Budget Unit
5. HHS—United States Department of Health and Human Services
6. MAP—Maximum Aid Payable

tion of the AFDC program. She argues that the department's regulations, by not recognizing the undocumented children as an integral part of the family unit and not considering their needs in determining the amount of income available to the citizen children, directly conflict with the primary purpose and paramount concerns of the AFDC program—protecting needy children from economic deprivation. The citizen children, she asserts, have the right to have the amount of her income actually available to them calculated in a fair and realistic manner.

We believe these arguments have considerable force as a matter of policy. Nevertheless, our review of the applicable provisions of state and federal law leads us to reject the statutory contention advanced by Ms. Darces. We will conclude that the department's policy of not considering the needs of undocumented children is consistent with the governing regulatory and statutory scheme.

Ms. Darces' alternative contention is that the department's regulations single out eligible children living with undocumented siblings for disparate treatment, in violation of equal protection under the state and federal Constitutions. We are therefore confronted with the task of passing on the constitutionality of state statutes and regulations which permit DSS to engage in the challenged practice.

At the outset we emphasize for conceptual clarity that Ms. Darces does not claim that undocumented aliens have a constitutional right to AFDC. Our focus, then, is on the disparate treatment accorded Ms. Darces' *citizen* children in the limited context of those cases, as here, wherein AFDC eligible children share the same home with undocumented siblings. Accordingly, we need not consider the more difficult question whether the purposeful, statutorily mandated discrimination in the welfare area against undocumented aliens because of *their* undocumented status violates equal protection. (Compare *Plyler* v. *Doe* (1982) 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382].)

As indicated, we are of the view that settled constitutional principles and social policy considerations unite in this case to point towards one result. We look to the California Constitution. For the reasons discussed below, we hold that the DSS regulations and state statute in issue sanction the allocation of burdens and benefits in a manner violative of the command of equal protection under the law.

I

Bernadette Darces (appellant), a resident of Los Angeles County, is a single parent who received AFDC benefits in 1979. The nub of her problem

is this: Because her three undocumented children are ineligible for aid, appellant is subjected to the legal fiction that she has only three needy children. Thus, she received an AFDC grant for her family of six children calculated by DSS to provide the minimum amount necessary to maintain a subsistence standard of living for a family of three children. It matters not that the eligible children live with three other needy children; the undocumented children do not exist for purposes of the AFDC program—they are neither "dependent children" nor "essential persons" in the regulatory jargon.

This inequity was not alleviated when appellant was able to obtain employment. The present controversy arose when DSS, in reducing the grant to the citizen children in the amount of the mother's nonexempt income, refused to disregard, or otherwise take into account, that portion of her earnings necessary to support the undocumented children. Appellant is thereby subjected to a second legal fiction: it is presumed that her total income is exclusively available to the citizen children and that she has no obligation to support the undocumented children. In effect, DSS not only refused to support the undocumented children, it refused to permit the mother to support them.

The facts are undisputed. Prior to March 1979, appellant received a monthly AFDC grant of $356 for the benefit of her three eligible children. The amount was calculated by Los Angeles County (county), as the agent of DSS in the administration of the AFDC program, in accordance with the method set forth in the Manual of Eligibility and Assistance Standards (EAS). The amount of an AFDC grant is based on the number of persons living in the home who are eligible for assistance. (See 42 U.S.C. § 602.) The EAS, promulgated by defendant Marion Woods (respondent) pursuant to his authority as director[2] of DSS to implement the AFDC program in California (Welf. & Inst. Code, § 10553), contains provisions defining the persons eligible for inclusion in the family budget unit (FBU). (See EAS § 44-203 et seq.) Due to their undocumented alien status, appellant and her three older children are ineligible for AFDC (45 C.F.R. § 233.50)[3] and are excluded from the FBU for purposes of determining the amount of the

---

[2]Although Marion Woods is no longer the director of DSS, we continue to use his name in this appeal for purposes of consistency and convenience. (See *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929].)

[3]"A state plan under . . . title IV-A (AFDC) . . . of the Social Security Act shall provide that an otherwise eligible individual, dependent child, or a caretaker relative or any other person whose needs are considered in determining the need of the child or relative claiming aid, must be either: [¶] (a) A citizen, or [¶] (b) An alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law, . . ." (45 C.F.R. § 233.50.)

AFDC grant (EAS § 44-206.1).[4] Accordingly, appellant's $356 grant was the maximum aid payable (MAP) for a three-person FBU under the statutory guidelines in effect in 1979. (See Welf. & Inst. Code, § 11450.)

On February 13, 1979, appellant was sent formal notice of proposed action advising her that her AFDC grant would be reduced. The county proposed to reduce appellant's grant from $356 a month to $154 a month because her employment income in January 1979, when this case originated, was $557.98. (The county is authorized to reduce an AFDC grant, under EAS § 44-315.1, when "[t]here is a change in need [or] income . . .") In computing the revised grant amount, the county deducted $269 from appellant's income for such expenses as child care and transportation costs. (See EAS §§ 44-133.3, 44-315.4.) This resulted in a net income of $269. The county is authorized to grant an additional deduction for appellant's personal needs even though she is an undocumented alien.[5] The county determined appellant's personal needs to be $67 a month. The needs of appellant's undocumented children were not considered, however, and no deduction from appellant's income was allowed for their needs. After these deductions and credits, appellant's remaining nonexempt income was calculated to be $202. The AFDC grant for the benefit of her eligible children was therefore determined to be $154, the $356 MAP for a three-member FBU having been reduced by $202 which represents the amount of appellant's earned income deemed available to her three citizen children.[6]

---

[4]Section 44-206.1 of the EAS provides in pertinent part: "The following persons must be excluded from the FBU . . .: [¶] (e) A person who refuses to cooperate on the verification of his/her citizenship or alien status."

[5]EAS section 44-133.3 applies "[i]f a parent living in the home is excluded from the Family Budget Unit for reasons other than being a recipient of another aid program, . . ."

[6]We summarize below the computation method by which appellant's AFDC grant was reduced from $356 to $154:

| | |
|---|---|
| Gross income | $557.98 (Rounded |
| Less mandatory deductions | 49.39 figure) |
| Less transportation expenses | 20.00 |
| Less child care costs | 220.00 |
| | 268.59 |
| Net income | $269.00 |
| MAP (4-member FBU) | $423.00 |
| MAP (3-member FBU) | 356.00 |
| Difference (needs of appellant) | $ 67.00 |
| Net income | $269.00 |
| Less needs of appellant | 67.00 |
| Nonexempt income deemed available to FBU | $202.00 |
| MAP (3-member FBU) | $356.00 |
| Less income "available" to FBU | 202.00 |
| Amount of Grant | $154.00 |

The MAP amounts in the above computation were the ones in effect in 1979. The MAP

In March 1979, appellant filed a request for a fair hearing with DSS challenging the proposed reduction in her AFDC grant by the above computation. The county's position, set out in the report of the DSS representative, was that "Mrs. Obando [appellant] and her three other children are not in the country legally and are therefore excluded from the budget." The hearing officer's proposed decision summarized appellant's position as follows: "Claimant contends that the county's allowance of a deduction from income for the needs of the excluded parent only is inequitable and unrealistic, because the needs of the excluded children are not being provided for either by AFDC grant or the excluded parent's income." The hearing officer denied appellant's claim, concluding that the county's action "was consistent with existing regulation [EAS § 44-133.3] and current policy . . . allowing income deduction for needs of the excluded parent only." The DSS adopted the proposed decision of the hearing officer on May 31, 1979.

Thereafter, appellant instituted the present action against respondent, as director of DSS, seeking a peremptory writ of mandate (Code Civ. Proc., § 1094.5) and an injunction restraining application of the challenged policy. Respondent filed an answer on July 9, 1980.

Appellant made a motion for summary judgment. Respondent countered with his own summary judgment motion. Subsequently, the parties filed their respective points and authorities and a stipulation to facts. Appellant's motion, which we will uphold, petitioned the trial court to permanently enjoin respondent from:

"(a) Failing to recognize any exclusion from the income of a caretaker for the needs of minor children not aided by the AFDC program, who are in the care of the caretaker;

"(b) . . . [A]ssuming income to be available to children who are aided by the AFDC program, which is not actually available because it is being used to provide for the needs of unaided minor children in the care of their caretaker."

Appellant, noting that "the focus of [her] argument is the eligible child [for whom a] minimum standard of care has been set by the State[,]" argued to the court below that "[i]f you do not deduct for the needs of the ineligibles, you are attributing income to the family budget unit that is not there and therefore you will not maintain the standard of need for the eligible child." The trial court concluded, however, that if certain family members

amounts have since been increased (see Welf. & Inst. Code, § 11450) but the method of calculation remains the same (see EAS § 44-133.3).

are deemed ineligible, a payment which does not fully consider nonexempt income as available to eligible children would effectively constitute an aid payment for ineligible persons. The court accordingly granted respondent's cross-motion for summary judgment. This appeal followed.

## II

The first question presented for decision is whether the challenged regulations, as applied to eligible children who reside with undocumented siblings, are inconsistent with the governing statutory scheme. We believe that respondent correctly followed the regulations which refuse to take into account the needs of appellant's undocumented children. The regulations, we conclude, are properly based on the statutes.

AFDC, a cooperative federal-state program financed with federal and state funds, is one of four categorical public assistance programs established by the Social Security Act of 1935 (Act).[7] (42 U.S.C. § 601 et seq.; Welf. & Inst. Code, § 11200 et seq.; see *King* v. *Smith* (1968) 392 U.S. 309, 316-317 [20 L.Ed.2d 1118, 1125-1126, 88 S.Ct. 2128].) To be eligible for federal funding, a state must formulate a plan which fulfills the requirements of section 602(a) of title 42 United States Code and meets the approval of the Secretary of Health and Human Services (HHS). (See implementing regulations at 45 C.F.R. § 233.10 et seq.) ▆▆ Although the individual states are not required to participate in the AFDC program, once a state elects to do so (and all do) it is bound to maintain a welfare system in compliance with the mandates of federal law as a condition of receiving federal financial grants. (42 U.S.C. §§ 601, 604 (a)(2); 45 C.F.R. § 201.5; *Shea* v. *Vialpando* (1974) 416 U.S. 251, 253 [40 L.Ed.2d 120, 125, 94 S.Ct. 1746]; see also *Rosado* v. *Wyman* (1970) 397 U.S. 397 [25 L.Ed.2d 442, 90 S.Ct. 1207].) California, as a participant in the AFDC program, must therefore administer its program in compliance with the federal eligibility standards established by the Act, as interpreted and implemented by regulations promulgated by HHS. (*Conover* v. *Hall* (1974) 11 Cal.3d 842, 847 [114 Cal.Rptr. 642, 523 P.2d 682].)

▆▆ As we recently noted in *Vaessen* v. *Woods* (1984) *ante,* pages 749, 755 [200 Cal.Rptr. 893, 677 P.2d 1183], two major purposes of the AFDC program are recognized: ". . . provid[ing] for the financial needs of families with dependent children so that the children may remain in their home. . . . [and] encouraging caretaker relatives to achieve self-support through

---

[7]The four categorical assistance programs are the Old Age Assistance (OAA) (42 U.S.C. § 301 et seq.); Aid to Families With Dependent Children (AFDC) (42 U.S.C. § 601 et seq.); Aid to the Blind (AB) (42 U.S.C. § 1201 et seq.); and Aid For the Permanently and Totally Disabled (APTD) (42 U.S.C. § 1351 et seq.).

employment . . . ." We are here concerned with the first, and more important, of these goals. (See *King* v. *Smith, supra,* 392 U.S. 309, 325 [20 L.Ed.2d 1118, 1130] ["Congress has determined that . . . the paramount goal" of the AFDC program is the care and protection of children].)

 ██ In order for a family with dependent children to qualify for AFDC benefits, the dependent children must be "needy" (as the term is defined in the standards established by the state).[8] In addition, they must be eligible for assistance by virtue of the absence, death, unemployment or incapacity of a parent, and must reside in the home of one of the enumerated adult caretaker relatives within a certain degree of kinship.[9] (42 U.S.C. § 606(a)(1); Welf. & Inst. Code, § 11250.) Therefore, under usual circumstances, the AFDC family unit will consist of at least two categories of individuals: the dependent child and the caretaker relative. The federal government requires participating states to provide AFDC benefits to these two categories of needy persons. (42 U.S.C. § 606(b).)

States have the option to include within the FBU, for purposes of calculating need, a third category of otherwise ineligible persons whose presence is deemed essential to the well-being of the recipients in the two mandatory categories. Section 602(a)(7) provides in relevant part: "[T]he state agency—[¶] (A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, *or of any other individual* (living in the same home as such child and relative) *whose needs the State determines should be considered in determining the need of the child or relative* claiming such aid . . . ." (Italics added.) (As amended Aug. 13, 1981, by the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub.L. No. 97-35, operative Oct. 1, 1981.) The implementing regulation for this third category of "essential persons" appears at 45 Code of Federal Regulations, section 233.20(a)(2)(vi).

The size of the FBU is therefore determined by the number of persons eligible to be included in each of the above categories—i.e., eligible depen-

---

[8]Under the joint federal-state operation of the AFDC program, the states are delegated the responsibility to set the minimum levels of subsistence need which determine a family's eligibility. (45 C.F.R. § 233.20(a)(2)(i); see Welf. & Inst. Code, § 11452. "The states have broad discretion to determine the minimum standards needed to maintain family life and to devise systems for determining financial eligibility and the amounts of assistance they will pay." (*Vaessen* v. *Woods, supra, ante,* at p. 755.) "[T]hese standards are '*minimum* basic standards of adequate care' and 'not necessarily reflective of actual need.'" (*Id.,* at p. 752.)

[9]Federal law limits the categories of eligible relatives to fathers, mothers, grandfathers, grandmothers, brothers, sisters, stepfathers, stepmothers, stepbrothers, stepsisters, uncles, aunts, first cousins, nephews, and nieces. (42 U.S.C. § 606(a).)

dent children, caretaker relatives and essential persons. The composition of the FBU is highly significant in that, as earlier noted, the statutorily established MAP amounts increase with the FBU size.[10] (Welf. & Inst. Code, § 11450.) In addition, the minimum basic standards of need, which are used to determine if a person is "needy," vary depending on the number of persons in the FBU. (Welf. & Inst. Code, § 11452.)

Under current California law only adult caretakers and their spouses are considered "essential persons." In 1981 the Legislature exercised its prerogative pursuant to federal law to limit the definition of "essential persons" by amending the Welfare and Institutions Code to add the following provision: "Needy relatives under this chapter include only natural or adoptive parents, the spouse of a natural or adoptive parent, and other needy caretaker relatives." (Welf. & Inst. Code, § 11203, as amended by Stats. 1981, ch. 69, § 6, operative Aug. 1, 1981.) At the time of the hearing, however, needy siblings of AFDC-eligible children and other needy persons (as presently defined in EAS § 44-215) qualified as AFDC recipients under the "essential persons" category pursuant to respondent's regulations then in effect. (See former EAS § 4-203.33.)[11] Appellant's three older children therefore would have qualified for inclusion in the FBU as "essential persons" had they been classified ineligible for reasons other than their undocumented status.[12] As noted in our recitation of facts, the county refused to consider the needs of the undocumented children because they "are not in the country legally."

■ The DSS regulations in effect in 1979 excluded, as they do now, undocumented aliens from membership in the FBU. (See former EAS § 44-206.15, superseded by EAS § 44-206.1(e), eff. Oct. 1, 1982; see *ante,* at fn. 4.) Respondent's practice was consistent with former Welfare and Institutions Code section 11104 which provided that aliens qualified for aid only upon certification under penalty of perjury of immigration status. This section was repealed in 1982 and a new section added which now provides: "Aliens shall be eligible for aid only to the extent permitted by federal law. [¶] An alien shall be eligible for aid if the alien has been lawfully admitted for permanent residence, or is otherwise permanently residing in the United

---

[10]The amount of AFDC benefits actually paid each month to eligible family members may vary because the FBU receives nonexempt income from time to time and AFDC benefits are reduced by the amount of net income available to the FBU. However, the total of nonexempt income and AFDC benefits paid will always add up to the applicable maximum aid payable (MAP). (See computation of appellant's nonexempt income, *ante,* at fn. 6.)

[11]EAS section 44-203, as amended, eliminates these categories of "essential persons" in conformity with amended section 11203 of the Welfare and Institutions Code.

[12]Similarly, appellant would qualify as an "essential person," even under the present statutory definition, but for the fact that she is undocumented.

States under color of law. No aid shall be paid unless evidence as to eligible alien status is presented." (Welf. & Inst. Code, § 11104; 1981-1982 First Ex. Sess., ch. 3, § 7-8.)

The language of new Welfare and Institutions Code section 11104 parallels that of 45 Code of Federal Regulations, section 233.50 and recently enacted 42 United States Code section 602(a)(33). The former federal regulatory section, in effect since 1973, was promulgated by the Secretary of Health, Education, and Welfare (the predecessor agency of HHS) and represents a long standing federal policy placing restrictions on undocumented aliens. (See fn. 3, *ante.*) This regulation was codified, in almost identical language, by the addition under the OBRA of a new paragraph to section 602(a) of title 42 United States Code which provides:

"[The State plan must:] . . . (33) provide that in order for any individual to be considered a dependent child, a caretaker relative whose needs are to be taken into account in making the determination under paragraph (7), or any other person *whose needs should be taken into account in making such a determination* with respect to the child or relative, such individual must be either (A) a citizen, or (B) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law . . . ."[13]

While appellant concedes that the applicable statutes and regulations expressly prohibit the inclusion of her undocumented children in the FBU, she nonetheless argues that their needs must be taken into account because the policies underlying the statutory scheme, as well as decisional authority, require recognition of the amount of income actually available to the citizen children.

We find this argument unpersuasive in the face of a statutory scheme that evinces the clear intent to exclude any and all consideration of the needs of undocumented children. As noted above, the enactment in OBRA of new paragraph (33) of 42 United States Code section 602(a), which parallels the language of the previously existing regulation (45 C.F.R. § 233.50), constitutes a statement, at the statutory level, of the federal government's consistent policy of refusing to take into account such needs. We have found no case since the 1973 enactment of the regulatory prohibition, nor has appellant apprised us of any, which has allowed consideration of the needs

---

[13]The term "under color of law" has been construed to permit the granting of benefits to an undocumented alien who possessed a letter from the Immigration and Naturalization Service indicating that it did not contemplate deportation proceedings. (See *Holley* v. *Lavine* (2d Cir. 1977) 553 F.2d 845, 851.) The record in the case at bench does not disclose whether appellant or her unaided children are residing in this country "under color of law."

of undocumented aliens. (Cf. *Ruiz* v. *Blum* (S.D.N.Y. 1982) 549 F.Supp. 871.)[14]

Paragraph (33) of section 602(a) requires that a person must be either a citizen or resident alien in order to have his or her needs "taken into account *in making the determination under paragraph (7)*" of the same section. (Italics added.) Paragraph (7) provides that the state agency shall "in determining need, take into consideration any other *income* and *resources* of any child . . . relative . . . or . . . [essential person] . . . ." (Italics added.) Read in context, it is readily apparent that the terms "taking into account needs" and "determining need," as used in paragraphs (33) and (7) respectively, have the same meaning: the consideration of income and resources available to the enumerated persons. Both paragraphs identify those persons whose needs "shall" be considered by reference to the three categories of persons we previously discussed: dependent children, caretaker relatives and essential persons. Thus, the state is authorized to consider the "income and resources" of those persons within the FBU by virtue of their qualification in one of the three categories. In addition, paragraph (8) (also applicable "in making the determination under paragraph (7)") makes further reference to the same three categories in its provisions outlining various income disregards. This consistency suggests that only the needs of FBU members may be considered in making the determination under the above-cited paragraphs.

There are a few exceptions to this general rule, such as provisions for stepparents,[15] which are not applicable in this case. Appellant is thus unable

---

[14]In *Ruiz*, a citizen child was found ineligible for day care services "on the ground of his mother's [undocumented] status." (549 F.Supp. at p. 877.) Defendants State Department of Social Services and the City of New York had terminated the services to the child after the mother had failed to document her status as a legal resident, as required by defendants' policy and practice. The court held that defendants' imposition of an *additional* condition of eligibility, not required by federal law, was inconsistent with the underlying purposes of the federal program there in issue (title XX of the Act). (*Ibid.*; see and cf. *Doe* v. *Shapiro* (D.Conn. 1969) 302 F.Supp. 761.) By contrast, in our case the citizen children were not found ineligible because of the mother's status and, more importantly, as we shall explain, the exclusion of the undocumented children is consistent with the statutory scheme and imposes no impermissible condition. The *Ruiz* court's statutory holding is therefore of limited precedential value, although, as will appear, its reasoning is relevant to our equal protection analysis.

[15]California, consistent with federal law, allows a deduction for "any amounts actually paid" by a stepparent to ineligible children *not* living in the home in determining the needs of eligible children with whom the stepparent lives. This rule applies where the stepparent is *not* part of the FBU and has a legal obligation to support the ineligible children. It is therefore consistent with case law requiring that income deemed available to eligible children from a nonlegally responsible relative be "actually available." (See 42 U.S.C. § 602(a)(31); 45 C.F.R. § 233.20(a)(3)(xiv); EAS § 44-133.6; e.g., *Lewis* v. *Martin* (1970) 397 U.S. 552 [25 L.Ed.2d 561, 90 S.Ct. 1282] [unrelated adult male]; *Van Lare* v. *Hurley* (1975) 421 U.S. 338 [44 L.Ed.2d 208, 95 S.Ct. 1741] [nonpaying lodger]; *Cooper* v. *Swoap* (1974) 11

to point to any statutory or regulatory provision which authorizes consideration of the needs of her undocumented children without bringing them into the FBU.

Our sole function is to ensure that the challenged regulations comport fully with federal law. (*County of Alameda* v. *Carleson* (1971) 5 Cal.3d 730, 749 [97 Cal.Rptr. 385, 488 P.2d 953].) Our inquiry is at an end once it is determined that respondent's regulatory practice is in compliance with the statutory scheme. Accordingly, respondent's practice of refusing to consider the needs of undocumented siblings of eligible children must be upheld unless it fails to meet the constitutional requirements of equal protection.

## III

We, therefore, take up appellant's constitutional contention that the challenged practice penalizes her eligible children solely on the basis of their status as siblings of undocumented aliens in violation of equal protection under the state and federal Constitutions.

The guarantees of equal protection embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the California Constitution "compel[] recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of Calif.* (1969) 71 Cal.2d 566, 578 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194]; *Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251].) "This principle, of course, does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose." (*In re King* (1971) 3 Cal.3d 226, 232 [90 Cal.Rptr. 15, 474 P.2d 983].) However, this deferential standard is inapplicable " 'in cases involving "suspect classifications" or touching on "fundamental interests" . . . .' " (*Ibid.*) In such cases "the state bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that distinctions drawn by the law are *necessary* to further its purpose." (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

Most recently the United States Supreme Court, in *Plyler* v. *Doe, supra,* 457 U.S. 202, 216 [72 L.Ed.2d 786, 799, 102 S.Ct. 2382, 2394], reviewed its decisions applying the familiar two-tier equal protection anal-

---

Cal.3d 856 [115 Cal.Rptr. 1, 524 P.2d 97] [recipient of adult aid]; *North Coast Coalition* v. *Woods* (1980) 110 Cal.App.3d 800 [168 Cal.Rptr. 95] [substitute parent]; *Camp* v. *Swoap* (1979) 94 Cal.App.3d 733 [156 Cal.Rptr. 600].)

ysis and set out the circumstances which require a more stringent standard of review than the traditional "fair relationship to a legitimate public purpose" (*ibid.*) standard: "[W]e would not be faithful to our obligations under the Fourteenth Amendment if we applied so deferential a standard to every classification. The Equal Protection Clause was intended as a restriction on state legislative action inconsistent with elemental constitutional premises. Thus we have treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.' With respect to such classifications, it is appropriate to enforce the mandate of equal protection by requiring the State to demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." (*Id.*, at pp. 216-217 [72 L.Ed.2d at p. 799, 102 S.Ct. 2394-2395]; fns. omitted.)

## A. Standard of Review

We begin our analysis with the task of choosing the standard of review appropriate for the evaluation of appellant's equal protection contention.

### 1. Nature of classification

Preliminarily, we consider the nature of the classification created by respondent. Respondent's regulations provide for the exclusion of individuals from the FBU in a variety of contexts.[16] Respondent's implementation of his department's eligibility requirements (which include EAS exclusionary provisions) creates two classes of AFDC-eligible children: those who reside with ineligible persons, and those who do not. As earlier noted, ineligible persons may nevertheless qualify for inclusion in the FBU as "essential persons" under section 11203 of the Welfare and Institutions Code. Appellant's three older children, however, cannot under any circumstances be included in the FBU because of their undocumented status. This brings us to the particular exclusion with which we are here concerned. The application of the statutorily mandated exclusion for undocumented aliens, as implemented by respondent's regulations, creates a subclass within the previously identified class of eligibles residing with ineligibles—namely,

---

[16]Some of the reasons a person may be ineligible for inclusion in the FBU include, inter alia: (1) child voluntarily excluded from the FBU because he/she has restricted income or property such as child support, social security or a trust fund (EAS § 44-133.8); (2) child fails to meet the age, school attendance, or work registration requirements (EAS §§ 42-101, 42-625, 42-631, 42-632); (3) person participates in a strike (EAS § 44-206.1(f)); (4) person refuses to furnish or to cooperate in securing a Social Security number (EAS § 44-206.1(c)); (5) child excluded as a result of the parent's decision not to cooperate in pursuing support from the absent parent (44.206.1(d)(2)); (6) child not deprived of parental support as required by Welfare and Institutions Code section 11250.

AFDC-eligible children who reside with persons who are ineligible because of their undocumented status.

Appellant does not argue that her undocumented children have a constitutional right to receive welfare benefits. Rather, she contends that although the challenged classification turns upon the status of the undocumented children, in practical effect it operates to deprive the *eligible* siblings of the full benefits to which they are entitled[17] while granting full benefits to those eligible children who do not reside with undocumented aliens. ■ ■■■ ■ Our focus, then, is on discrimination (in the provision of AFDC benefits) against eligible children who, through no fault of their own, must live in the same home as their undocumented siblings.[18] The Legislature, having chosen to extend AFDC benefits to eligible children, then denies them, in part or whole, to a small class of eligible children solely on the basis of their familial relationship and residency with undocumented aliens.

This case thus comes before us in an unusual posture in that it is the rights of citizens—not undocumented aliens—that are implicated. This situation is not unlike cases involving illegitimate children wherein the challenged classification is dependent upon the marital status of the parents but operates in effect to deprive children of their rights. The United States Supreme Court has consistently struck down legislation which discriminates against illegitimate children, reasoning that it is "illogical and unjust" to deprive a child "simply because its natural father has not married its mother." (*Gomez* v. *Perez* (1973) 409 U.S. 535, 538 [35 L.Ed.2d 56, 60, 93 S.Ct. 872]; see also *Trumble* v. *Gordon* (1977) 430 U.S. 762 [52 L.Ed.2d 31, 97 S.Ct. 1459]; *Weber* v. *Aetna Casualty & Surety Co.* (1972) 406 U.S. 164 [31 L.Ed.2d 768, 92 S.Ct. 1400].) We should be similarly hostile to legislative classifications which deprive eligible children of governmental beneficence

[17]In appellant's case, her eligible children are benefitted to a lesser extent, though not entirely excluded, because of DSS's presumption that the undocumented children are not part of the family unit. In other cases, however, the result may be a complete denial of benefits. Because a family's minimum standards of need are calculated by reference to the size of the FBU (Welf. & Inst. Code, § 11452), it is probable that in cases where the undocumented children outnumber the eligible children, such families will be rendered completely ineligible for benefits.

[18]Of course, "[i]nvidious discrimination may appear in either an impermissible statutory purpose, *see Gomillion* v. *Lightfoot,* [1960] 364 U.S. 339, 341, . . .; *Yick Wo* v. *Hopkins* [(1886) 118 U.S. 356, 369], or in the choice of a classification that is impermissibly discriminatory as applied to achieve a valid legislative purpose. *Cf. Hirabayashi* v. *United States* [1949] 320 U.S. 81 . . .; *Korematsu* v. *United States* [(1944) 323 U.S. 214, 216]." (*Diaz* v. *Weinberger* (S.D.Fla. 1973) 361 F.Supp. 1, 9; revd. on other grounds 426 U.S. 67 [48 L.Ed.2d 478, 96 S.Ct. 1883].) We must assume—without deciding—that Congress and our state Legislature may constitutionally enact, as they have done, a blanket prohibition excluding undocumented aliens from participation in welfare programs such as AFDC. It is irrelevant for purposes of this case whether undocumented aliens do or do not have a constitutional right to welfare benefits.

simply because they are brothers or sisters of undocumented aliens. The fact that the children in the above-cited cases can be readily identified in a word—illegitimates—while it is more difficult to find a convenient label to describe the affected class in this case should not obscure the fundamental principle that when the Legislature differentiates between similarly situated persons, it must comport with the equal protection guarantees of the Constitution.

Appellant correctly points out that the line drawn by respondent between AFDC-eligible children who live with undocumented siblings and eligible children who do not is clearly irrelevant to the goals and objectives of the AFDC program. The members of both classes are similarly situated with respect to the legitimate purpose of the AFDC program—the relief of eligible, needy children. All are needy, and meet the statutory criteria for assistance, and yet, one class of children is singled out for unequal treatment solely on the basis of the undocumented status of their family members—a factor unrelated to dependency, and over which they have no control. ■ ■ ■ ■ Thus, if this classification is to be sustained, the state must justify the lines it has drawn among similarly situated persons.[19]

2. Strict scrutiny is the appropriate standard of review.

■ The question, then, is whether the state need show only that its classification is reasonably related to a legitimate governmental objective— or whether it must comply with the mandate of the more stringent equal protection test by demonstrating "that its classification has been precisely tailored to serve a compelling governmental interest." (*Plyler, supra,* 457 U.S. at p. 217 [72 L.Ed.2d at p. 799, 102 S.Ct. p. 2395].) ■ As we have already noted, this court must employ the latter, "active and critical analysis" in cases involving "suspect classifications" or touching on "fundamental interests." (*Serrano* v. *Priest, supra,* 18 Cal.3d 728, 761 (*Serrano II*), quoting from *Serrano I, supra,* 5 Cal.3d at p. 597.) ■ We find ourselves unable to agree with respondent's two principle contentions.

---

[19]The state may not avoid this burden on the ground that its policy and practice is to deny benefits to undocumented children, not eligible children. In *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187] (*Serrano I*), this court entertained the contention that a classification, neutral on its face and not unfairly administered, is not constitutionally infirm by reason of its discriminatory effect in the absence of purposeful or intentional discrimination. We rejected this contention "for want of a solid foundation in law and logic[,]" observing that prior decisions by this court and the United States Supreme Court have invalidated " 'unintentional' classifications whose impact simply fell more heavily" on one class "even in the absence of discriminatory motivation." (*Id.,* at pp. 602-603; citing e.g., *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]; *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]; *In re Antazo* (1970) 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999].)

Respondent first contends that because this case involves legislation and regulation in the economic and social welfare area, it must be governed by *Dandridge* v. *Williams* (1970) 397 U.S. 471 [25 L.Ed.2d 491, 90 S.Ct. 1153], and other cases employing the rational basis test. (See, e.g., *Richardson* v. *Belcher* (1971) 404 U.S. 78 [30 L.Ed.2d 231, 92 S.Ct. 254]; *Lindsey* v. *Normet* (1972) 405 U.S. 56 [31 L.Ed.2d 36, 92 S.Ct. 862]; *Jefferson* v. *Hackney* (1972) 406 U.S. 535 [32 L.Ed.2d 285, 92 S.Ct. 1724]; *United States* v. *Kras* (1973) 409 U.S. 434 [34 L.Ed.2d 626, 93 S.Ct. 631].) As will appear, respondent's reliance on *Dandridge* and its progeny is misplaced to the extent that none of the above-cited cases involved even a colorable claim of discrimination. *Dandridge* itself notes that a statutory classification does not violate equal protection if it is both "rationally based *and free from invidious discrimination.*" (397 U.S. at p. 487 [25 L.Ed.2d at p. 503]; italics added.)

In *Dandridge* the high court sustained a state statute, which imposed a maximum grant available to welfare recipients regardless of family size, against a claim of violation of equal protection. Recipients with large families whose standard of need exceeded the maximum grant contended that their families were disadvantaged in relation to small needy families. In rejecting the claim, the court acknowledged the "dramatically real difference" between state regulation of business and welfare assistance, which "involves the most basic economic needs of impoverished human beings," but nonetheless applied the rational basis constitutional standard of review. (397 U.S. at p. 485 [25 L.Ed.2d at p. 502].) The court concluded that "[i]n the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' [Citation.]" (397 U.S. at p. 485 [25 L.Ed.2d at pp. 501-502].)

Appellant in the instant case does not challenge the mathematical imperfections with which the state allocates welfare benefits. Of course, "[t]here is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need . . . ." (*King* v. *Smith, supra,* 392 U.S. 309, 318 [20 L.Ed.2d 1118, 1126].) Appellant complains, though, that once the state establishes standards of need it cannot create two classes of eligible children, one of which is singled out for unequal treatment on the basis of factors unrelated to the objectives of the statutory and regulatory scheme. Appellant contends that the state has drawn distinctions between otherwise eligible children and that the classification is presumptively invidious as it discriminates against a

discrete and powerless minority—namely, eligible children who reside with undocumented siblings.[20]

Respondent next contends that appellant's three younger children are not members of a suspect class because it is their siblings' trait—rather than their own—which is the basis of the differential treatment. He urges that it would be a "novel approach to equal protection" to hold that the traits of the undocumented children place their siblings in a suspect classification. In this regard, respondent argues that because the class affected by the challenged practice is comprised of citizens and documented aliens, the Supreme Court's recent decision in *Plyler* v. *Doe, supra,* 457 U.S. 202 [72 L.Ed.2d 786, 102 S.Ct. 2382], involving discrimination against *un*documented aliens, is inapposite. While we agree that the holding in *Plyler* is not squarely applicable here, we think that the high court's analysis and reasoning is especially pertinent.

The Supreme Court in *Plyler* held that a Texas statute denying undocumented children free public school education violated equal protection. The threshold question before the court was whether undocumented aliens were "persons" within the meaning of the Fourteenth Amendment. In a 1971 decision the high court had declared that "[a]liens as a class are a prime example of a 'discrete and insular' minority." (*Graham* v. *Richardson* (1971) 403 U.S. 365, 372 [29 L.Ed.2d 534, 542, 91 S.Ct. 1848].)[21] *Gra-*

---

[20]We quickly dispose of respondent's suggestion that there is no discrimination or disparate treatment in this case. He argues that the application of EAS section 44-133.3 (computation of income of parent excluded from FBU) to appellant did not lessen the total amount of resources available to her family. Respondent is, of course, correct in his assertion that the reduction in appellant's AFDC grant reflected only that the source of the resources had changed as appellant's income was taken into consideration; thus, appellant's total resources were $356 per month before and after the reduction. This is so because both before and after the grant reduction, the needs of appellant's undocumented children were not taken into consideration. Respondent, however, cannot escape the fact that the total resources (regardless of source) deemed the minimum necessary for the eligible children were less than the amount they would have received had they lived in a family of six eligible children— i.e., appellant's family of *six* children received the minimum amount the state has determined is necessary to prevent deprivation for a family of *three* children. Appellant's constitutional contention—that her eligible children are treated unequally because of respondent's policy of not considering the needs of her undocumented children—remains viable regardless of whether she has income in any given month. That this case arose in the context of a grant reduction hearing is of no legally significant consequence. As respondent notes, the total resources remained the same; accordingly, the eligible children's alleged deprivation remained the same. Her basic complaint that respondent refuses to consider the needs of her undocumented children in computing the grant remains unanswered. Respondent, having prevailed on statutory grounds, cannot now rely on the statutory and regulatory provisions (Welf. & Inst. Code, § 11104; EAS § 44-206.1(e)) which we earlier held authorized his practice but whose constitutionality is now at issue.

[21]Two years prior to *Graham,* this court had held that discrimination on the basis of alienage "invokes a strict standard of review." (*Purdy & Fitzpatrick* v. *State of California, supra,* 71 Cal.2d 566, 579.)

*ham* held discrimination against resident aliens "inherently suspect and . . . therefore subject to strict judicial scrutiny" (*ibid.*) regardless of "whether or not a fundamental right is impaired" (*id.,* at p. 376 [29 L.Ed.2d at p. 544]).[22] In *Plyler,* the court held that undocumented aliens "may claim the benefit of the Fourteenth Amendment" (457 U.S. at p. 215 [72 L.Ed.2d at p. 798, 102 S.Ct. at p. 2394]; cf. *Cabral* v. *State Bd. of Control* (1980) 112 Cal.App.3d 1012 [169 Cal.Rptr. 604]), but it perfunctorily dismissed in a footnote the contention that undocumented aliens are a suspect class (457 U.S. at p. 219, fn. 19 [72 L.Ed.2d at p. 800, 102 S.Ct. at p. 2396] cf. *id.* at p. 235, fn. 3 [72 L.Ed.2d at p. 811, 102 S.Ct. at p. 2404], conc. opn. by Blackmun, J.). Nor was strict scrutiny warranted because education was involved, the court held, since education is not a fundamental right. (*Id.,* at p. 223 [72 L.Ed.2d at p. 803, 102 S.Ct. at p. 2398], citing *San Antonio* v. *Rodriguez* (1973) 411 U.S. 1, 28-39 [36 L.Ed.2d 16, 39-47, 93 S.Ct. 1278].)

Nevertheless, the high court concluded in *Plyler* that heightened judicial scrutiny was required because "more is involved in these cases than the abstract question whether [the statute] discriminates against a suspect class, or whether education is a fundamental right. [The statute] imposes a lifetime hardship on *a discrete class of children not accountable for their disabling status.*" (457 U.S. at p. 223 [72 L.Ed.2d at p. 803, 102 S.Ct. at p. 2398]; italics added.) Accordingly, the court employed its now familiar "intermediate" standard of review requiring the state to show that the discrimination furthers a "substantial" state interest. (See, e.g., *Craig* v. *Boren* (1976) 429 U.S. 190 [50 L.Ed.2d 397, 97 S.Ct. 451]; *Lalli* v. *Lalli* (1978) 439 U.S. 259 [58 L.Ed.2d 503, 99 S.Ct. 518].)

The primary underpinning of *Plyler*—that innocent children cannot be explicitly disadvantaged on the basis of their status of birth—unquestionably applies to the instant case. In both cases the classifying trait is one over which the children have no control: the undocumented status of a family member who in coming to this country, albeit illegally, placed the children in their disadvantaged position. Justice Brennan, writing for the majority in *Plyler,* reasoned that the Texas statute could not pass constitutional muster because it "direct[ed] the onus of a parent's misconduct against his children" who "are present in this country through no fault of their own." (457

---

[22]In subsequent cases, the Supreme Court has somewhat wavered in its view that alienage classifications are suspect. In a recent case the court has explained that "restrictions on lawfully admitted aliens which affect economic interests are subject to heightened judicial scrutiny." (*Cabell* v. *Chavez-Salido* (1982) 454 U.S. 432, 439 [70 L.Ed.2d 677, 102 S.Ct. 735, 739].) However, the exclusion of aliens from political or governmental functions has been upheld without application of strict scrutiny. (See, e.g., *Ambach* v. *Norwick* (1979) 441 U.S. 68 [60 L.Ed.2d 49, 99 S.Ct. 1589]; *Foley* v. *Connelie* (1978) 435 U.S. 291 [55 L.Ed.2d 287, 98 S.Ct. 1067].)

U.S. at pp. 220, 226 [72 L.Ed.2d at pp. 801, 805, 102 S.Ct. at pp. 2396, 2400].) Similarly, a recent federal district court decision held that the state cannot "victimize the citizen child or a lawfully resident child and deprive it of [day care services] . . . based solely on his mother's [undocumented] status . . . ." (*Ruiz* v. *Blum, supra,* 549 F.Supp. 871, 877.) As Justice Powell noted, concurring in *Plyler,* these holdings "find support in decisions of this Court with respect to the status of illegitimates. In *Weber* v. *Aetna Casualty & Surety Co.,* 406 U.S. 164, 175 (1972), we said: '[V]isiting . . . condemnation on the head of an infant' for the misdeeds of the parents is illogical, unjust, and 'contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing.' [¶] In these cases, the State of Texas effectively denies to the school-age children of illegal aliens the opportunity to attend the free public schools that the State makes available to all residents. They are excluded only because of a status resulting from the violation by parents or guardians of our immigration laws and the fact that they remain in our country unlawfully. The respondent children are innocent in this respect. They can 'affect neither their parents' conduct nor their own status.' *Trimble* v. *Gordon,* 430 U.S. 762, 770 (1977)." (457 U.S. at p. 238 [72 L.Ed.2d at p. 813, 102 S.Ct. at p. 2406], conc. opn. by Powell, J.)

In the present case, appellant's citizen children are denied welfare benefits although, like the children in *Plyler,* they are "innocent" with respect to their parents' violation of the immigration laws. We cannot agree with respondent's position that *Plyler* is distinguishable because it involved education. We note that the court did not have to ground its holding upon a finding that education is a "fundamental right." (Cf. *Serrano II, supra,* 18 Cal.3d 728.) Indeed, Justice Powell's concurring opinion suggests that the court's decision in *Plyler* is applicable in the welfare context: "If the *resident* children of illegal aliens were denied welfare assistance, made available by government to all other children who qualify, this also—in my opinion—would be an impermissible penalizing of children because of their parents' status." (457 U.S. at p. 239, fn. 3 [72 L.Ed.2d at p. 813, 102 S.Ct. at p. 2406] italics added.) We conclude that heightened judicial scrutiny is warranted in this case.

What is the standard for such heightened judicial scrutiny? ■ Our state equal protection clause is "possessed of an independent vitality" from the Fourteenth Amendment. (*Serrano II, supra,* 18 Cal.3d 728, 764.)[23] ■ We hold that the challenged practice in this case should be reviewed under the strict scrutiny test.

---

[23]In explaining our holding in *Serrano I,* this court made clear in *Serrano II* that "our state equal protection provisions, while 'substantially the equivalent of' the guarantees con-

In holding that strict scrutiny is warranted—indeed compelled—in this case, we do so in recognition that constitutional safeguards can be preserved only by rejecting a rigid, categorical approach to equal protection. It would be truly incongruous to hold that appellant's alien children are entitled to heightened protection but not their brothers and sisters who live in the same home and suffer the same disadvantage.

We have thus far emphasized the *reason* appellant's children constitute a discrete minority—their inability to control their parents' conduct. Equally crucial to our holding is the *fact* that appellant's citizen children are classified on the basis of an immutable trait—they cannot forsake their birth into an undocumented family. They are "saddled with [the same] disabilities [and] subjected to [the same] history of purposeful unequal treatment" as their brothers and mother. (*San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, 28 [36 L.Ed.2d 16, 39].) Indeed, the challenged classification touches upon two traits that have been historically disfavored—national origin and ancestry. (See, e.g., *Hernandez* v. *Texas* (1954) 347 U.S. 475 [98 L.Ed. 866, 74 S.Ct. 667] [national origin]; *Takahashi* v. *Fish Game Comm.* (1948) 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138] [origin and ancestry]; *Oyama* v. *California* (1948) 332 U.S. 633 [92 L.Ed. 249, 68 S.Ct. 269] [same]; *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064] [race, alienage, national origin].) As in these lineage cases, appellant's children are classified on the basis of an immutable trait and are relegated to an inferior status into which they are locked by accident of birth. For all of the foregoing reasons, the classification in the present case must be strictly scrutinized.[24]

## B. No Compelling State Interest in Classification

 We now reach the point in our analysis where respondent must show a compelling state interest that is furthered by the classification he has

---

tained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable. We have recently stated in a related context: '[I]n the area of fundamental civil liberties—which includes . . . all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law.' [Citations omitted.]" (18 Cal.3d at p. 764, quoting *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].)

[24]In light of our holding, we need not discuss whether any "fundamental rights" are implicated in this case.

drawn. Respondent fails to discharge his burden of proof under this test. He identifies only fiscal concerns, and argues that the state can ill-afford to take into account the needs of undocumented aliens. Preservation of the fisc is an insufficient justification. The high court in *Plyler* rejected a similar contention, noting that "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources. [Citation.] The state must do more than justify its classification with a concise expression of an intention to discriminate. [Citation.]" (457 U.S. at p. 227 [72 L.Ed.2d at p. 806, 102 S.Ct. at p. 2400].)

Respondent advances a second, though related, contention. He asserts that he is required by federal law to exclude consideration of the needs of undocumented children. Thus, he argues, failure to comply with the federal guidelines may result in the expulsion of the state from the AFDC program. This contention must be rejected on two grounds.

First, as we earlier noted, any consideration of the needs of undocumented children clearly results in funding those children in violation of federal law. However, respondent utterly fails to explain how the goal of complying with the federal standards is furthered by the exclusion of undocumented children from the FBU. Short of police enforcement, there is no way respondent can compel a mother to feed only her citizen children and leave the others to starve. It would defy all logic to assume that appellant would permit only her eligible children to be beneficiaries of the AFDC grant—whatever the amount—to the exclusion of her undocumented children. As one court observed in a related context, "any attempt to quantify the precise degree of benefit to each would be an exercise in semantic futility." (*Ruiz* v. *Blum, supra,* 549 F.Supp. 871, 875.) Indeed, respondent's papers before this court concede that appellant must of necessity have allocated a portion of her AFDC grant for the benefit of her undocumented children. The reality is that undocumented children living with eligible siblings use AFDC funds in any event; the latter group simply has a lesser grant as a result of respondent's policies.

Secondly, we note that state noncompliance with federal law does not in itself mean that the state will be precluded from participating in the AFDC program. The Supreme Court has struck down state laws inconsistent with federal law in those cases where the state practice resulted in a lower grant than would have been obtained under the federal regulations. (See, e.g., *King* v. *Smith, supra,* 392 U.S. 309; *Rosado* v. *Wyman, supra,* 397 U.S. 397.) When presented with this very question, one state court held that there is no authority "for the proposition that a participating state may not have a *more liberal* eligibility standard for AFDC recipients than that required as a *minimum*" by federal regulations. (*Ottman* v. *Fisher* (Me. 1974) 319

A.2d 56, 62, original italics.) The Supreme Court has noted in this regard that "there is nothing in the federal statute that prohibits a State from making vendor payments so long as they are made from state funds without federal matching." (*Engelman* v. *Amos* (1971) 404 U.S. 23, 24 [30 L.Ed.2d 143, 145, 92 S.Ct. 181].) In short, DSS may include undocumented aliens in its FBU calculations so long as the grant in these cases is derived exclusively from state funding. Respondent's second contention remains, in essence, a fiscal one.

Neither of the state interests advanced by respondent amounts to a constitutionally compelling state interest that justifies his policy and practice of under-funding those families, like appellant's, comprised of citizens and undocumented members. We have thus concluded that the classification created by appellant's practice of excluding undocumented aliens from the FBU is invidiously discriminatory, as applied to families like appellant's, and violates the equal protection rights of eligible children in such families. We therefore hold that, under our state Constitution,[25] undocumented aliens, who would otherwise be eligible for AFDC but for their immigration status, must be included in the family budget unit for purposes of calculating the grant amount in those limited cases where the failure to do so would result in a reduction in, or denial of the maximum aid payable benefits to which the eligible persons—United States citizens or lawfully resident aliens—are entitled.

The judgment is reversed. Appellant's motion for summary judgment, we have seen, seeks to permanently enjoin defendant from enforcing regulations which (1) exclude the need of minor children not aided by AFDC and (2) assume the availability of income to children who are aided by AFDC when in fact the income is not available. Consistent with the views we have expressed, the trial court is instructed to grant appellant's motion for summary judgment.

Bird, C. J., Mosk, J., and Broussard, J., concurred.

KAUS, J., Concurring.—I too conclude that—as applied in this case—the challenged administrative regulation (EAS 44-133.3) is invalid, but I reach this conclusion for reasons quite distinct from those of the majority opinion. In my view, the controlling federal statutes and regulations prohibit the state from reducing the AFDC recipients' benefits on the basis of that portion of

---

[25]In light of our conclusion that respondent's policy violates the equal protection clause of our state Constitution, we need not decide whether it also violates the Fourteenth Amendment of the federal Constitution. We are confident, however, that application of the intermediate level of review—which we infer from our reading of *Plyler* is the appropriate standard—will obtain the same result.

their mother's income which—as both a legal and practical matter—is not actually available for the recipients' support. Because the state regulation conflicts with applicable federal law, there is no need to reach the constitutional issues on which the majority opinion relies.

To begin with, there is no question but that Ms. Darces' three youngest children, who are United States citizens, are properly entitled to receive AFDC benefits. In determining the amount of benefits they receive, federal law contemplates that the state will take into account the income of their caretaker, here their mother. (See, e.g., 42 U.S.C. § 602(a)(7).) In this case, however, the mother's total income is not actually available for the support of the AFDC recipients because the mother is under a state-imposed legal obligation to support her three older, undocumented alien children as well as her three younger children. (Civ. Code, §§ 196, 242.) The governing federal regulations make it abundantly clear that only income which is "actually available" to the AFDC recipients—income which their caretaker has the "legal ability to make . . . available for [their] support and maintenance"—may properly be considered in reducing the recipients' benefits,[1] and the United States Supreme Court has invalidated a variety of state regulations that have improperly reduced AFDC benefits by "attributing" to recipients income that is not in fact available to them. (See, e.g., *Lewis* v. *Martin* (1970) 397 U.S. 552, 559-560 [25 L.Ed.2d 561, 567, 90 S.Ct. 1282]; *Van Lare* v. *Hurley* (1975) 421 U.S. 338, 346-347 [44 L.Ed.2d 208, 215-216, 95 S.Ct. 1741]. See also *Cooper* v. *Swoap* (1974) 11 Cal.3d 856, 870-871 [115 Cal.Rptr. 1, 524 P.2d 97]; *Waits* v. *Swoap* (1974) 11 Cal.3d 887, 895 [115 Cal.Rptr. 21, 524 P.2d 117].) It seems clear to me that in light of these federal authorities, the state may not reduce the recipients' benefits by "assuming"—contrary to both the legal and practical realities— that all of the mother's income is available for the recipients' support.[2]

In defense of the state regulation, the Attorney General relies on a portion of the federal statute which declares that, in order to comply with federal law, a state program must "provide that in order for any child to be con-

---

[1]Title 45, part 233.20(a)(3)(ii)(D) of the Code of Federal Regulations currently provides in relevant part: "Net income . . . and resources available for current use shall be considered; income and resources are considered available *both when actually available and when the applicant* or recipient has a legal interest in a liquidated sum and *has the legal ability to make such sum available for support and maintenance.*" (Italics added.)

[2]Actually, the state regulation at issue here does recognize that a portion of the mother's income must go for *the mother's* own support, and does not count that portion of her earnings as income to be deducted from the AFDC recipients' grant. The regulation authorizes this reduction even though the mother—as an undocumented alien—is not counted as part of the "family budget unit." The problem in this case arises simply because the state has not applied the same rationale—which, as noted above, is mandated by federal law—to the *portion of the mother's income which is not available to the recipient children because it must legally be used to support the undocumented alien children.*

sidered a dependent child, or caretaker whose needs are to be taken into account in making the determination under paragraph (7), or any other person whose needs should be taken into account in making such a determination with respect to the child or relative, such individual must be either (A) a citizen, or (B) an alien lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." (42 U.S.C. § 602(a)(33) [hereafter paragraph (33)].)

Read in conjunction with the applicable statutory references, however, paragraph (33) simply means that an undocumented alien cannot be either (1) a direct recipient of AFDC benefits or (2) what the federal regulations term an "essential" person whose presence in the recipients' household is used in determining the size of the recipients' "family budget unit." Plaintiff in this case does *not* contend that her three undocumented alien children should be counted for either of those purposes. Contrary to the Attorney General's contention, nothing in paragraph (33) suggests that income which *is not,* in fact, available to the AFDC recipients because it must legally be used to support an undocumented alien child, may nonetheless be considered income which *is* available to the recipients.[3] Neither the legislative history of paragraph (33)[4] nor any judicial authority supports the Attorney General's reading of the provision, and such an interpretation would clearly fly in the face of the federal precedents prohibiting the reduction of benefits on the basis of fictional attributions of income.

---

[3]The Attorney General argues that if the state were to take into consideration the fact that a portion of the mother's income must go to support the undocumented alien children, it would be "tak[ing] into account" the "needs" of the undocumented alien children in violation of paragraph (33). The argument is misguided. This portion of the mother's income must properly be excluded simply because it is not available to the recipient children, *not* because it is being used to meet the needs of undocumented aliens. If the mother were legally obligated to support some other individual, the portion of her income devoted to such support would—in like manner—also not be counted as income to her recipient children because it would not be actually available to them. Indeed, as noted in footnote 2, *ante,* in the very regulation at issue here the state has recognized both the necessity and the propriety of excluding the portion of the mother's income necessary for her own support, even though the mother is herself an undocumented alien.

Displaying a similar confusion, the trial court—in upholding the regulation—reasoned that if the mother's support obligations to her undocumented alien children were taken into account, the resulting increase in the AFDC recipients' net benefits would in effect constitute an aid payment to the ineligible undocumented alien children. Under that reasoning, however, any deduction from the mother's income—for example, for transportation expenses incurred in earning the income—could be viewed as improper aid payment to an "ineligible recipient," e.g., the local bus company. In truth, such deductions from income are necessary to insure that the recipients' minimal benefits are reduced only by a sum that is in fact available for the recipients' support.

[4]Paragraph (33) is a 1981 codification of a long-standing administrative policy which limited eligibility for AFDC benefits to citizens or lawfully admitted aliens. (See 45 C.F.R. former § 233.50 [promulgated in 1973].)

In short, federal law has long provided that AFDC benefits may not be reduced on the basis of income which is not actually available to a recipient, and the state regulation as applied here violates that fundamental principle. Accordingly, I conclude that the judgment upholding the reduction in plaintiff's benefits must be reversed.

Grodin, J., and Richardson, J.,* concurred.

Respondent's petition for a rehearing was denied July 12, 1984. Lucas, J., was of the opinion that the petition should be granted.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.